# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                               Case No. 05-CR-146

MARK A. CUBIE,
ORLANDES NICKSION,
RONALD Q. TERRY,
ANTHONY L. BURKE,
DELANO HILL,
EDWARD CUBIE,
SYLVESTER PIGRAM, and
JOSE LOPEZ,

        Defendants.

---

**RECOMMENDATION AND ORDER RE: DEFENDANTS' PRETRIAL MOTIONS**

---

## I. BACKGROUND

On June 7, 2005, a grand jury sitting in the Eastern District of Wisconsin returned a seven-count indictment, together with a forfeiture provision, in which Mark Cubie ("Mark Cubie" or "Mark"), Orlandes Nicksion ("Nicksion"), Ronald Q. Terry ("Terry"), Anthony L. Burke ("Burke"), Delano Hill ("Hill"), Edward Cubie ("Edward Cubie" or "Edward"), and Sylvester Pigram ("Pigram"), were named as defendants. Count One charges each of the defendants with, beginning sometime in 2004 and continuing through May 16, 2005, knowingly and intentionally conspiring to distribute controlled substances, to wit, cocaine and "crack cocaine," in violation of Title 21 U.S.C. §§ 841(a)(1) and 846. Counts Two and Three charge Mark Cubie with distribution of a controlled substance and possession of a controlled substance with intent to distribute the same, on January 28,

2005 and February 2, 2005, respectively, in violation of Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  Count Four charges Mark Cubie with knowingly carrying a firearm during and in relation to the drug trafficking crime charged in Count Three of the indictment, in violation of Title 18 U.S.C. § 924(c)(1)(A)(i).  Count Five charges Mark Cubie with possession of a firearm by a convicted felon on February 2, 2005, in violation of Title 18 U.S.C. § 922(g)(1).  Count Six charges Mark Cubie and Terry with possession of a controlled substance with intent to distribute the same on May 12, 2005, in violation of Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  Count Seven charges Nicksion with possession of a firearm by a convicted felon on May 16, 2005, in violation of Title 18 U.S.C. § 922(g)(1).

On July 19, 2005, a superseding indictment was returned by the grand jury.  The criminal charges set forth in the superseding indictment are the same as were set forth in the original indictment.  However, an additional person, Jose Lopez ("Lopez"), was added as a defendant in Count One, the drug conspiracy charge.

All of the defendants were arraigned on the indictment and on the superseding indictment, and all defendants entered not guilty pleas to the charges.  After a scheduling conference was held with counsel for the defendants, a briefing schedule was entered by this court for all pretrial motions. In accordance with that briefing schedule, a number of the defendants filed pretrial motions.

Mark Cubie filed a "Motion to Suppress Title III Wire Intercepts" (dkt. 134); a Motion to Suppress "all evidence that was recovered during the February 2, 2005 stop, and search, of the defendant's vehicle" (dkt. 126); a "Motion to Suppress the Evidence Recovered During the Execution of the Search Warrant at the Defendant's Residence" (dkt. 131); a "Motion for a Santiago Hearing" (dkt. 133); a "Motion to Strike Surplusage" (dkt. 129); a "Motion to Require Notice of

2

Intent to Use 'Other Crimes, Wrongs or Acts' Evidence" (dkt. 132); and a "Motion to Disclose Identity of the Confidential Informants" (dkt. 130).

Nicksion filed a "Motion to Suppress all Evidence Seized as a Result of the Title III Interception of Cellular Telephone Calls Involving Orlandes Nicksion" (all of Nicksion's motions were consolidated into a single document, dkt. 117); a "Motion to Suppress Fruits of Search at 8666 S. Chicago Avenue, Oak Creek, Wisconsin"; a "Motion to Suppress All Information Garnered from the 'Data Loader' Installed on Nicksion's Vehicle on April 26th, 2005"; a Motion for a "Santiago" Hearing; a Motion to Identify Confidential Informants; and a Motion "to Sever the Trial of Orlandes Nicksion from the Trial of the Other Defendants."

Terry filed a "Motion to Suppress All Electronic Surveillance" (dkt. 128); a Motion to sever Terry's trial from that of his co-defendants (dkt. 122); a "Motion for Pretrial Determination of Admissibility of Co-Conspirator's Statements" (dkt. 125); a "Motion to Compel Pre-trial Disclosure of Intent to Use 'Other Crimes, Wrongs or Acts' Evidence" (dkt 135); and a "Motion for Discovery and Inspection" (dkt. 124).

Hill filed a "Motion to Suppress Title III Intercepted Telephone Calls" (dkt. 116); a Motion to sever Hill's trial from that of his co-defendants (dkt. 115); a "Motion to Require Notice of Intent to use 'Other Crimes, Wrongs or Acts' Evidence" (dkt. 114); a "Motion for Pretrial Determination of Admissibility of Co-Conspirator's Statements" (dkt 113); a "Motion for Disclosure of Impeaching Information" (dkt. 112); and a "Motion for Discovery and Inspection Concerning Government's Use of Informants, Operatives and Cooperating Individuals" (dkt. 111).

Edward Cubie filed a "Motion to Suppress Title III Intercepted Calls" (dkt. 121); a "Motion to Sever" his trial from that of his co-defendants (dkt. 119); a "Motion for Pretrial Determination of

3

Admissibility of Co-Conspirator's Statements" (dkt. 120); and a "Motion for Discovery and Inspection Concerning Government's Use of Informants, Operatives and Cooperating Individuals" (dkt. 118).

Pigram filed a "Motion to Suppress Title III Intercepted Calls" (dkt. 127) and a Motion to Sever his trial from that of his co-defendants (dkt. 123).

Finally, Lopez filed a "Motion to Suppress Title III Intercepted Telephone Calls" (dkt. 136); a "Motion for Pretrial Determination of Admissibility of Co-Conspirators' Statements" (dkt. 138); and a Motion to sever his trial from that of his co-defendants (dkt. 137).

On November 14, 2005, the government filed its "Consolidated Response" to the defendants' pretrial motions (dkt. 167), at least with respect to those motions which it believed did not require an evidentiary hearing to resolve. In turn, the defendants subsequently filed their replies in support of their respective motions. As to those motions which, in the court's view, required evidentiary hearings to resolve, such hearings were conducted and the parties were allowed to file post-hearing briefs. Those post-hearing briefs were filed and have been considered by the court. Thus, the defendants' pretrial motions have now been fully briefed and are ready for resolution.

## II. DISCUSSION

### A. Motions to Suppress Evidence from Title III Intercepts

Mark Cubie, Nicksion, Terry, Hill, Edward Cubie, Pigram, and Lopez have filed motions to suppress evidence obtained as a consequence of the Title III intercepts which were authorized by Chief United States District Judge Rudolph T. Randa.

By way of background, there were actually three Title III interception applications. All applications were supported by affidavits executed by Kenneth Smith, a detective for the Milwaukee

4

Police Department (MPD) assigned to the High Intensity Drug Trafficking Area (HIDTA) Joint Drug Gang Task Force and also designated as a federally-deputized task force agent for the United States Department of Justice. Detective Smith was the lead agent investigating this case. The first application, filed on April 25, 2005, was for the interception of wire communications occurring to and from a cellular telephone assigned telephone number (414) 460-5638, a prepaid Sprint Spectrum LP cellular telephone number with no subscriber information and bearing electronic serial number (ESN) 24702953922, and believed to be used by Mark Cubie. (Gov't's Resp., Ex. 1.) On May 12, 2005, the government filed a second application for the interception of wire communications occurring to and from (414) 406-0804, a Nextel cellular telephone number subscribed to by Ms. Orlandes Nicksion at 1126 Peregrine, Groveland, Florida, bearing ESN 919VEE02F1, and believed to be used by defendant Nicksion; and to and from (773) 416-2111, a U.S. Cellular cellular telephone number subscribed to Jose G. Lopez at 1675 N. Western Avenue, Chicago, Illinois, bearing ESN 03903264408, and believed to be used by defendant Lopez. (Gov't's Resp., Ex. 2.) A third application was filed on June 14, 2005, seeking an extension of the previous wire-tap authorization for (773) 416-2111. (Gov't's Resp., Ex. 3.)

The only ground upon which Mark Cubie relies in asserting that evidence obtained from the wire-tap should be suppressed is the following:

> [t]he identification of the phone number (4144605638), and its alleged use, and ownership, by the defendant, Mark Cubie, was the product of the unauthorized monitoring of Denise Coleman's, and other persons', telephones beginning in April, 2005. The affidavit in support for the wire intercept of 414-460-5638 identifies many instances of law enforcement monitoring phone calls that were not court-authorized. At par. 61, the agent identifies 120 phone calls between Denise Coleman's phone (336-5975) and 460-5638 between April 7 and 11, 2005. At par. 73, there are similar instances of monitoring phone calls to 460-5638 before the court authorized any

5

monitoring of 460-5638. Nowhere in the discovery is there any information that any of the monitored phones, including 460-5638, were court authorized.

(Mark Cubie's Mot. at 4-5, dkt. 134.)

Nicksion's challenge to the wire intercepts is premised on (1) the failure of the government to show necessity for the wiretaps and (2) the failure of the government to properly minimize the wiretaps. Specifically, Nicksion asserts:

At the time of the initial Title III wiretap applications, the discovery materials in this case demonstrate that less intrusive, normal law enforcement methods had successfully produced an abundance of evidence . . . and were, therefore, successful.

. . . Further, upon review of the discovery materials turned over to defense counsel including the summaries of the telephone calls, the government intercepted numerous telephone calls to which Orlandes Nicksion was a party and the topic of the discussion was plainly non-criminal in nature.

(Nicksion's Mot. at 4, dkt 117.)

Terry challenges the intercept orders on the following grounds:

(1) the application was not a full and complete statement because Agent Smith stated that he had additional relevant facts which were not presented; (2) that the application on its face fails to establish the need for a wiretap because the government possessed substantial evidence at the time of the application (i.e., none of the investigative techniques have failed); and (3) the calls were not properly minimized per the court's order.

(Terry's Mot. at 2, dkt. 128.) Hill challenges the wire intercepts on precisely the same grounds as Terry challenges them. (Hill's Mot. at 1-2, dkt. 116.)

Edward Cubie challenges the wire intercepts on the following grounds:

It is the defendant's contention that the wiretap was unnecessary and should not have been issued because there was sufficient information available to law enforcement to ascertain the extent of this alleged conspiracy. In short, the government had not exhausted all available investigative techniques and those techniques that were utilized were sufficient to identify the alleged participants and the extent of the conspiracy.

6

(Edward Cubie's Mot. at 1-2, dkt. 121.)

Pigram asserts that his motion challenging the wire intercepts is

based on the belief that the application was not a full and complete statement because
Detective Smith stated that he had additional relevant facts which were not presented
and that the application on its face fails to establish the need for a wiretap because the
government possessed substantial evidence at the time of the application (i.e., none
of the investigative techniques have failed).

(Pigram's Mot. at 1-2, dkt. 127.)

Finally, Lopez's motion challenging the wire intercepts is based on the following:

(1) the application was not a full and complete statement because Agent Smith stated
that he had additional relevant facts which were not presented; (2) the application on
its face fails to establish the need for a wiretap because the government possessed
substantial evidence at the time of the application in that none of the investigative
techniques have failed; and (3) the calls were not properly minimized per the Court's
order.

(Lopez's Mot. at 1-2, dkt. 136.)

As is apparent from the foregoing, although each moving defendant has filed his own motion

challenging the legality of the intercepts, the challenges all boil down to generalized challenges to

the wire-tap authorizations on the following grounds: (1) the government did not establish necessity;

(2) the government did not properly minimize conversations; (3) the government did not give a full

a complete statement of the facts and circumstances supporting the requests for authorization; and

(4) the basis for the wire-taps was illegal.  Each of the four challenges will be addressed in turn.

**1.  Necessity**

Title 18 U.S.C. § 2518(3) provides, in pertinent part, that:

Upon . . . application the judge may enter an ex parte order, as
requested or as modified, authorizing or approving interception of
wire, oral or electronic communications within the territorial

7

jurisdiction of the court in which the judge is sitting . . . if the judge determines on the basis of the facts submitted by the applicant that -

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 2516 of this chapter;

> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interceptions;

> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

> (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

It is not sufficient, however, in order to obtain a court order authorizing interception of wire or oral communications, that the government show probable cause to believe that a crime has been or will be committed, and communications concerning such offense or offenses will be obtained through interception. In addition, the government must demonstrate to the issuing judicial officer that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This is oftentimes referred to as the "necessity" requirement. It is to this particular point that most of the defendants direct much of their argument.

Title 18 U.S.C. § 2518(1)(c) requires that an application for an electronic intercept contain "[a] full and complete statement as to whether or not investigative procedures have been tried and

8

failed <u>or</u> why they reasonably appear to be unlikely to succeed if tried <u>or</u> to be too dangerous." (emphasis provided).

It is only necessary for the government to establish one of the three alternatives listed in the statute. *United States v. Adams,* 125 F.3d 586, 595 (7th Cir. 1997); *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988). This provision, which is commonly referred to as the "exhaustion requirement," *United States v. Anderson*, 542 F.2d 428, 430 (7th Cir. 1976), is to ensure that wiretaps are not "routinely employed as the initial step in criminal investigations." *United States v. Giordano*, 416 U.S. 505, 515 (1974). But, the government's burden of establishing compliance with § 2518(1)(c) "is not great" and the requirement that the government exhaust "normal investigative procedures" is to be reviewed in a "practical and common sense fashion." *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995); *Zambrana*, 841 F.2d at 1329; *Anderson*, 542 F.2d at 431. Indeed, the government need not show exhaustion of all other possible investigative efforts in order to justify an interception order. Rather, the law requires that the government show that the success of other methods appear unlikely. *Zambrana,* 841 F.2d at 1329.

Most recently, the Seventh Circuit stated as follows:

> To receive a wiretap order, the government need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means. *Plescia*, 48 F.3d at 1463. We have upheld the "necessity" of wiretap orders on the basis that investigators were "having trouble fingering other members of the conspiracy," *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991), and that the wiretaps "allowed the government to ascertain the extent and structure of the conspiracy." *Plescia*, 48 F.3d at 1463.

*United States v. McLee*, __ F.3d __, 2006 WL 240569 at * 9 (7th Cir. 2006). And, for purposes of reviewing a challenge to the exhaustion requirement, a court will "apply an abuse of discretion standard, giving substantial deference to the determination of the issuing judge." *Zambrana,* 841

F.2d at 1329-30.  Applying the foregoing standards, I have no difficulty in finding that the affidavits filed in support of the wiretap applications satisfied the exhaustion requirement.

As stated previously, there were three Title III intercept applications.  The original application filed on April 25, 2005, included a supporting affidavit signed by Detective Smith.  Thereafter, each application was supported by an affidavit of Detective Smith which incorporated by reference the affidavits submitted in support of the prior applications.

In his first affidavit, Detective Smith sets forth information which the government maintains supported the necessity for the wiretap.  This "necessity" information is found in paragraphs 80 through 104 of that affidavit.  (Gov't Resp., Ex. 1.)  In support of issuance of the second intercept order,  the information relating to "necessity" is presented in paragraphs 55 through 83 of the affidavit, which was filed on May 12, 2005.  (Gov't Resp., Ex. 2.)  Finally, in support of the issuance of the third intercept order, the information relating to "necessity" is presented on pages 15 through 22 of the affidavit, which was filed on June 14, 2005.  (Gov't Resp., Ex. 3.)  Those paragraphs and the information presented on those pages set forth reasons why normal investigative procedures were either tried and failed, reasonably appeared unlikely to succeed identifying the entire scope of the criminal activity of the drug organizations that were being investigated, or were too dangerous to employ.  More specifically, the information set forth in the first and second affidavits (which information is echoed in the subsequent affidavit) demonstrates, in summary, the following.

Despite its use by law enforcement agents, physical surveillance had not been able to fully identify possible locations used by Mark Cubie and Nicksion to sell and store cocaine, to identify members of their drug trafficking organization in Milwaukee and Chicago, and to identify Lopez's source(s) of drugs.  This was due to the difficulty of following targets while the targets were driving

10

erratically and using counter surveillance techniques. It was also due to the difficulty associated with surveilling the activities of the targets, given the locations of their residences and businesses. In that regard Detective Smith avers as follows:

> Cubie, Nicksion, and Lopez each live in multi-unit apartment complexes off major roads that do not provide adequate cover for undetected law enforcement surveillance or adequate surveillance of the targets' specific apartments. Lopez's business, located at 1675 N. Western Avenue in Chicago, presents a similar problem in that Western Avenue is an extremely busy street and parking opportunities for surveillance is limited. Cubie and Nicksion use 2945 N. 53rd St. in Milwaukee as their primary stash house for the drugs they distribute. This residence is located in a residential neighborhood where most of the individuals that live on the street park on the street in front of their homes. This leaves few parking opportunities for surveillance vehicles and because it is a single family residential area, the residents of the street are quick to point unfamiliar vehicles. The targets also meet their associates in varied locations throughout the Milwaukee and Chicago areas.

(Gov't's Resp., Ex. 2 at ¶61.) Finally, physical surveillance was not fully successful because

> the targets take precautions in handling the drugs that they distribute. Cubie often has other individuals drive cocaine that he receives from Lopez from Chicago to Milwaukee in a vehicle separate from Cubie. Lopez often had other unknown individuals assisting him while conducting transactions with Cubie. These other associates present real problems for effective surveillance when case agents must decide which target or vehicles to follow.

(Gov't's Resp., Ex. 2 at ¶ 62.)

Use of grand jury subpoenas would be of limited use because "[t]he likelihood of receipt of records relevant to further identifying the targets' drug trafficking organization beyond Milwaukee and Chicago . . . is minimal [because] the targets regularly use alias names, multiple addresses, and nominee persons to rent vehicles, subscribe to telephones, and pay utilities at various locations in order to hide their criminal activities from law enforcement." (Gov't's Resp., Ex. 2 at ¶ 64.) Moreover, the use of grand jury subpoenas would alert the targets to the existence of the investigation, causing them to be more cautious in their activities, to flee, to take steps to avoid

11

investigation or prosecution, and to threaten the lives of the informants. (Gov't's Resp., Ex. 2 at ¶ 65.) Additionally, calling any of the targets or their associates before the grand jury would be of no use since they would undoubtedly invoke their Fifth Amendment privilege not to testify. (Gov't's Resp., Ex. 2 at ¶ 66.)

With respect to the use of confidential informants, although law enforcement had used confidential informants during the course of the investigation, their continued use would be of limited value because "[e]ach of the confidential informants have had limited contact with each of the principle targets, Cubie, Nicksion, and Lopez. The targets with whom the confidential informants have had contact with [sic] have intentionally isolated the confidential informants from more widespread knowledge of the organization." (Gov't's Resp., Ex. 2 at ¶ 67.)

As to the use of undercover agents, Detective Smith averred that it was his belief

that individuals involved in the sale of controlled substances are naturally wary of meeting new people, and that they attempt to insulate themselves from illegal activities of the organization. Nothing in the investigation to date indicates that an introduction of an undercover agent to the targets through a confidential informant would be successful. . . . Even if the introduction of an undercover agent were able to be made into the organization, it would still be unlikely that the goals of this investigation would be satisfied. Due to the scope of this investigation, it is very unlikely that an undercover agent would be able to infiltrate the organization beyond the local participants in the Milwaukee and Chicago areas, and therefore, would have limited capacity in obtaining information related to the source of supply of drugs to the organization.

(Gov't's Resp., Ex. 2 at ¶ 71.)

With respect to interviews of the subjects of the investigation, Detective Smith averred that he believed such investigative technique would be fruitless. Even if the subjects agreed to be interviewed, there would be no way to determine if they were telling the truth, as opposed to trying to divert the investigating agents' from their actual criminal activities. Moreover, Detective Smith

12

further averred that Mark Cubie and some of his associates had in fact been approached by law enforcement personnel during traffic stops. On each occasion, those individuals gave false information to the law enforcement officers. (Gov't Resp., Ex. 2 at ¶ 74.)

According to Detective Smith, search warrants and garbage searches would likewise not appear to be a feasible alternative to electronic surveillance. First of all, Smith did "not reasonably believe that [as of May 12, 2005] there [was] probable cause to search many of the residences and locations believed to be associated with the targets' drug trafficking activities." (Gov't Resp., Ex. 2 at ¶ 79.) And even if there were probable cause, "[t]he execution of search warrants at any location identified to date would alert the targets to the investigation and thereby risk jeopardizing the ongoing investigation; as well as, impede any chance to learn the identities of additional co-conspirators, including the targets' source(s) of supply." (Gov't Resp., Ex. 2 at ¶ 77.)

Finally, although several pen registers and trap and traces had been ordered for telephone numbers believed to be associated with the targets, the information provided by such devices is limited in value. More precisely, use of the devices does not necessarily provide information as to where a subject is when placing or receiving calls to and from the target telephone number. (Gov't Resp., Ex. 2 at ¶ 81.)

As previously noted, for purposes of reviewing a challenge to the exhaustion requirement, a court will "apply an abuse of discretion standard, giving substantial deference to the determination of the issuing judge." *Zambrana*, 841 F.2d at 1329-30. In my view, as the above summary illustrates, Detective Smith's affidavits set forth information adequate to demonstrate to the issuing judicial officer that "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Such

13

being the case, to the extent that the defendants' motions to suppress evidence obtained by way of the intercept orders issued by Chief Judge Randa on April 25, 2005, on May 12, 2005, and on June 14, 2005, are predicated on the claim that the applications did not demonstrate the requisite "necessity," it will be recommended that their motions to suppress be denied.

## 2. Minimization

Some of the defendants' motions to suppress are also grounded on the proposition that the government failed to properly minimize the intercepted calls to ensure that only criminally-related conversations were intercepted.

Specifically, Nicksion asserts that "upon review of the discovery materials turned over to defense counsel including the summaries of the telephone calls, the government intercepted numerous telephone calls to which Orlandes Nicksion was a party and the topic of the discussion was plainly non-criminal in nature." (Nicksion's Mot. at 4, dkt 117.)

Terry asserts in his motion that

> [t]he undersigned [Terry's counsel] has, among other things, listened to all 16 calls wherein Terry's voice is heard. The conversations are either unintelligible, or require translation, or are clearly about nothing. Thus, surveillance should have ceased as it was readily apparent that no criminal activity appears to be taking place. The government's redaction of the information on these calls is either taken out of context or clearly misleading.

(Terry's Mot. at 6, dkt 128.)

Hill asserts in his motion that "[t]he undersigned counsel has listed [sic] to at least 35 to 40 of the wiretaps for which Mr. Hill was allegedly on the telephone. On calls tapped on a variety of days, the calls should have ceased as it was readily apparent that no criminal activity appears to be

14

taking place.  The government's rendition of the information on these calls is misplaced and taken out of context."  (Hill's Mot. at 5-6, dkt 116.)

Finally, Lopez asserts that "[c]onversations contained in the wiretaps for which Mr. Lopez was allegedly on the telephone continued when it was clear that they were not criminal in nature." (Lopez's Mot. at 5, dkt. 136.)

In my opinion, these moving defendants' challenges are insufficiently particularized to merit being treated as anything other than "generalized challenges" to the government's minimization efforts.  They will thus each be treated as a generalized challenge to the government's minimization efforts.

Minimization is required by 18 U.S.C. § 2518(5) which states, in pertinent part:

> Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

In turn, 18 U.S.C. § 2518(10)(a) provides, in pertinent part, that:

> Any aggrieved person in any trial, hearing or proceeding in or before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that -
>
> . . . .
>
> (iii) the interception was not made in conformity with the order of authorization or approval.

The Supreme Court interpreted the minimization provision of Title III in *Scott v. United States*, 436 U.S. 128, 140 (1978):

The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

When a defendant makes a generalized minimization challenge, the government bears the burden of making a prima facie showing of reasonable compliance with the minimization requirements. *United States v. Quintana*, 508 F.2d 867, 875 (7th Cir. 1975). The burden then shifts to the defendant to show why the surveillance was improper. *Id.* The defendant must show that the minimization could have been better accomplished while still allowing the government to achieve its legitimate objectives. *Id.*

Courts have set forth numerous reasons to justify a finding of statutory compliance in the face of evidence that a significant number of non-pertinent calls were intercepted. "It has often been remarked that large and sophisticated narcotics conspiracies may justify considerably more interceptions than would a single criminal episode." *United States v. Suquet*, 547 F. Supp. 1034, 1036-37 (N.D. Ill. 1982) (citing *Quintana*, 508 F.2d at 874). The location of the tapped phone is also extremely important. *Suquet*, 547 F. Supp. at 1037. A third systemic consideration is the extent of supervision exercised by the authorizing judge. "Where the judge has required and reviewed [interim] reports at frequent intervals, courts have been more willing to find a good-faith attempt to minimize unnecessary interceptions." *Quintana*, 508 F.2d at 875. Obviously, a reviewing court is more likely to sanction a surveillance if it has already been subjected to extensive and contemporaneous oversight. *Suquet*, 547 F. Supp. at 1037.

As for particular calls, several types are essentially exempted from the requirements of minimization. These include calls which are "very short"; those which are "one-time only" and

16

involve unidentified voices; and, those which are "ambiguous in nature," particularly if they contain "guarded or coded language." *Id.* (citing *Scott*, 436 U.S. at 140). Indeed, in *United States v. Dumes*, 313 F.3d 372 (7th Cir. 2002), the Seventh Circuit stated that, "[f]ollowing *Scott*, some courts have held that calls of less than 2 minutes do not require minimization. *See United States Malekzadeh*, 855 F.2d 1492 (11th Cir. 1988); *United States v. Apodaca*, 820 F.2d 348 (10th Cir. 1987). We certainly agree that minimization of short calls is not required." *Dumes*, 313 F.3d at 380.

Moreover, in order to determine whether the government properly minimized interceptions of conversations, a test of reasonableness is applied to the particular facts of each case. *Scott,* 436 U.S. at 139. Absent "an unreasonable" intrusion, neither Title III nor the Fourth Amendment are violated. *United States v. Dorfman*, 542 F. Supp. 345, 390 (N.D. Ill. 1982). To establish an unreasonable intrusion, a defendant must do more than identify particular calls which he contends should not have been intercepted. Rather, he must establish a pattern of interception of innocent conversations which developed over the period of the wiretap. *Id.* at 391. The obligation to minimize only requires that the government agents exercise good faith, reasonable efforts to minimize. Where a good faith effort has been made, the overall interception is valid, even though some non-pertinent calls are monitored. *See United States v. Falcone*, 364 F. Supp. 877, 885 (D.N.J. 1973). Indeed, "perfection is not usually attainable, and is certainly not legally required." Instead, the "government is held to a standard of honest effort." *United States v. Cleveland*, 964 F. Supp. 1073, 1092 (E.D. La. 1997).

The court in *Scott* observed as follows:

The type of use to which the telephone is normally put may also have some bearing on the extent to minimization required. For example, if the agents are permitted to tap a telephone because one individual is thought to be placing bets over the phone,

substantial doubts as to minimization may arise if the agents listen to every call which goes out over that phone regardless of who places the call. On the other hand, if the phone is located in the residence of a person who is thought to be the head of a major drug ring, a contrary conclusion may be indicated.

*Scott*, 436 U.S. at 140. More recently, in *United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002), the court had the following to say with respect to factors to be considered in determining whether the government's minimization efforts are sufficient.

Although the adequacy of the government's minimization efforts necessarily depends on the facts of each case, relevant considerations include the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that nonpertinent calls will be minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use of code, and the extent to which the authorizing judge oversaw the interception efforts.

*Mansoori*, 304 F.3d at 647.

In discharging its burden of making a prima facie case of reasonableness in regard to its minimization efforts, the government sets forth the following information in its brief.

On April 25, 2005, the Honorable Rudolph T. Randa, Chief United States District Judge for the Eastern District of Wisconsin, signed an order authorizing the interception of wire communications over the cellular telephone number (414) 460-5638 for a period of 30 days.

On May 12, 2005, Chief Judge Randa signed an order authorizing the interception of wire communications over cellular telephone numbers (414) 406-0804 and (773) 416-2111 for a period of 30 days.

On June 14, 2005, Chief Judge Randa signed an order authorizing the continued interception of wire communications over the cellular telephone number (773) 416-2111 for a period of 30 days.

18

The investigation prior to authorized monitoring revealed that Mark Cubie was the primary user of (414) 460-5638, Orlandes Nicksion was the primary user of (414) 406-0804, and Jose Lopez was the primary user of (773) 416-2111.

Authorized monitoring confirmed Mark Cubie, Nicksion, and Lopez as the primary users of the aforementioned numbers. Monitoring also revealed that many of the other co-defendants had drug trafficking-related conversations with Mark Cubie, Nicksion, and/or Lopez over the above telephone numbers.

Subsequent to each of the above-referenced wire-tap authorizations, and prior to when each authorized wire-tap was activated, minimization instructions were given by the supervising Assistant United States Attorneys (AUSAs), Daniel Sanders and Michelle Jacobs, to the case agents tasked with monitoring the calls. The case agents also received a copy of the interception order, the supporting affidavit, and a fairy detailed memorandum outlining the minimization procedures to be followed.

In addition, the supervising AUSAs submitted detailed reports to Chief Judge Randa approximately every ten days during each authorization period. The reports summarized the number of calls, the number of calls in which audio communications were intercepted, the number of call deemed pertinent, the number of calls lasting over two minutes, and the number of calls minimized. Each report contained a summary of the status of the investigation during the period covered by the report.

Lastly, attached to each submitted report were copies of the pertinent call summary reports maintained by the monitoring agents during the period covered by each ten day report. The pertinent call summary reports described each call in some detail, including the call number, date, time,

duration, nature (incoming or outgoing), known subscriber information, telephone numbers associated with the call, and a brief summary of the monitoring agent's contemporaneous understanding of the substance of the call and identity of the participants.

Moreover, in its brief the government provided a chart, in which the number and type of calls intercepted during the course of the interception periods were summarized. That chart is as follows:

|  | Total calls | Audio Calls | Pertinent | Minimized | 2 minutes + |
|---|---|---|---|---|---|
| **(414) 460-5638**<br>4/26/05 - 5/17/05 | 2,519 | 1,313 | 407 | 35 | 146 |
| **(414) 406-0804**<br>5/12/05 - 5/17/05 | 515 | 282 | 87 | 4 | 59 |
| **(773) 416-2111**<br>5/12/05 - 7/12/05 | 9,326 | 5,215 | 760 | 337 | 1,044 |

(Gov't's Resp. at 35)

The government argues that, with the foregoing presentation, it has made out a prima facie case of reasonableness in regard to minimization efforts. I agree with the government. And indeed, it would appear that the defendants agree with the government as well. This is because none of the defendants have submitted further argument on the minimization issue in their respective reply briefs.

As stated previously, when a defendant makes a generalized minimization challenge, the government bears the burden of making a prima facie showing of reasonable compliance with the minimization requirements. *United States v. Quintana*, 508 F.2d 867, 875 (7th Cir. 1975). The burden then shifts to the defendant to show why the surveillance was improper. *Id.* The defendant must show that the minimization could have been better accomplished while still allowing the government to achieve its legitimate objectives. *Id.*

20

The government has made a prima facie showing of reasonable compliance with minimization requirements. The defendants have not responded to such showing by demonstrating with any specificity why surveillance was improper. Such being the case, to the extent that the defendants' motions to suppress evidence obtained by way of the intercept orders issued by Chief Judge Randa on April 25, 2005, on May 12, 2005, and on June 14, 2005, are predicated on the claim that the government did not properly minimize the interceptions, it will be recommended that their motions to suppress be denied.

**3. Full and Complete Statement of Facts Supporting Authorization Requests**

Some of the defendants argue that Detective Smith's affidavits in support of the application for the wire intercept were somehow defective because in paragraph 12 of his April 25, 2005 affidavit, in paragraph 12 of his May 12, 2005 affidavit, and in paragraph 11 of his June 14, 2005 affidavit he avers the following:

> Because this affidavit is submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for an order authorizing interception of wire communications to and from the above described target telephones.

(Gov't's Resp., Ex. 1 at ¶ 12; Ex. 2 at ¶ 12; Ex. 3 at ¶ 11.)

Title 18 U.S.C. § 2518 provides, in pertinent part as follows:

(1) each application for an order authorizing or approving the interceptions of a wire, oral, or electronic communication under this chapter . . . shall include the following information:

> . . . .

> (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued . . .

21

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

Terry, Hill and Lopez all argue that "[a]n application for a wiretap must set forth, basically, all of the evidence possessed by the government to that point." (Terry's Mot. at 4, dkt. 128; Hill's Mot. at 5, dkt 116; Lopez's Mot. at 4-5, dkt. 136.) Similarly, Nicksion argues that "[i]n essence, the application must set forth the totality of the government's case at that point in time." (Nicksion's Mot. at 17, dkt. 117.) Thus, the moving defendants argue that because Detective Smith's affidavits expressly set forth that he has "not included each and every fact known" to him, the provisions of 18 U.S.C. § 2518(b) and (c) were violated.

To begin with, none of the defendants cite any authority for the proposition that an applicant for a wiretap must "set forth, basically, all of the evidence possessed by the government to that point" to be in compliance with the statute's requirement that a "full and complete statement" be given to the issuing court. And this court has not found any authority for such a weighty proposition. The court will assume, however, that the defendants are arguing that there were omissions of fact that, had they been included in Detective Smith's affidavit, would have dispelled probable cause for issuance of the intercept order. *See Franks v. Delaware*, 438 U.S. 154 (1978). In order to obtain a hearing on such claim, the moving defendants would need to make a "substantial preliminary showing" that the affiant, i.e., Detective Smith, intentionally or recklessly included a false statement in the warrant affidavit or, in this case, omitted certain facts which, had they been included, would have undermined probable cause or justification for the intercept order. In other words, in order to be granted an evidentiary hearing and, more substantively, in order to prevail on their motions to suppress, the moving defendants would need to show that the omissions were material. As the court

22

stated in *United States v. Lefkowitz*, 618 F.2d 1313 (9th Cir. 1980), "the *Franks* rationale also permits an attack on search warrants obtained by affidavits marred by omissions of facts required to prevent technically true statements in the affidavit from being misleading." *Lefkowitz*, 618 F.2d at 1317 n.3.

The Seventh Circuit Court of Appeals has held that a defendant "bears a substantial burden to demonstrate probable falsity." *United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987). This is also true where, as here, the allegation is not so much that false statements were included in the warrant affidavit, but, rather that the affiant omitted certain facts from the affidavit which, if included, would have undermined a finding of probable cause. *See United States v. Kimberlin*, 805 F.2d 210, 252 (7th Cir. 1986); *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984). In *Kimberlin*, the court, in addressing and rejecting the defendant's challenge under *Franks* stated:

> The argument [of the defendant] is derived from the holding in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). There the Court decided that a defendant, within prescribed limits, has a right to challenge the truthfulness of factual statements made in an affidavit supporting the warrants. The standard which must be met is that of "deliberate falsehood or of reckless disregard for the truth." *Id*. at 171, 98 S.Ct. 2684. Here the claim rests upon an omission. *Cf. United States v. Lefkowitz*, 618 F.2d 1313, 1317 n. 3 (9th Cir. 1980), where the Ninth Circuit assumed, without deciding, "that the *Franks* rationale also permits an attack on search warrants obtained by affidavits marred by omissions of facts required to prevent technically true statements in the affidavit from being misleading."

*Kimberlin*, 805 F.2d at 252.

To reiterate, in a case such as this where a defendant makes a *Franks* challenge to a warrant based on omissions, he must demonstrate that there were omissions of fact which were made by the affiant knowingly, deliberately, or with reckless disregard, and that the omissions were material. That is to say, if the facts had been included, the affidavit would not have supported a finding of probable cause or justification for the intercept order.

23

The moving defendants have not sustained their burden on this issue. To the contrary, the moving defendants have not set forth any facts (much less made a substantial preliminary showing) to demonstrate that Detective Smith's averments were false in any respect. Nor have they made a substantial preliminary showing that there were omissions of fact, which were made by Detective Smith knowingly, deliberately, or with reckless disregard, and that such omissions were material. Such being the case, to the extent that the defendants' motions to suppress evidence obtained by way of the intercept orders issued by Chief Judge Randa on April 25, 2005, on May 12, 2005, and on June 14, 2005, are predicated on the claim (as construed by this court) that there has been a *Franks* violation, it will be recommended that their motions be denied.

### 4. Illegal Basis for Wiretaps

Finally, and as previously stated, the only ground upon which Mark Cubie relies in asserting that evidence obtained from the wire-tap should be suppressed is the following:

> [t]he identification of the phone number (4144605638), and its alleged use, and ownership, by the defendant, Mark Cubie, was the product of the unauthorized monitoring of Denise Coleman's, and other persons', telephones beginning in April, 2005. The affidavit in support for the wire intercept of 414-460-5638 identifies many instances of law enforcement monitoring phone calls that were not authorized. At par. 61, the agent identifies 120 phone calls between Denise Coleman's phone (336-5975) and 460-5638 between April 7 and 11, 2005. At par. 73, there are similar instances of monitoring phone calls to 460-5638 before the court authorized nay monitoring of 460-5638. Nowhere in the discovery is there any information that any of the monitored phones, including 460-5638, were court authorized.

(Mark Cubie's Mot. 4-5, dkt 134.) To be sure, if there had been interceptions of communications without a court order, such as Mark Cubie suggests, that might be problematic. However, in its response the government makes clear that the information to which Cubie refers in his memorandum

24

does not involve interceptions of communications. Rather, the information appearing in Paragraph 61 is based on telephone records obtained by a court order pursuant to 18 U.S.C. § 2703(d) under Application No. 5073. That order was issued on April 12, 2005, by the Honorable Aaron E. Goodstein, United States Magistrate Judge for the Eastern District of Wisconsin. That order specifically required a telephone service provider to disclose historical connection records for (414) 460-5638 dating back to March 1, 2005. Furthermore, according to the government, the court order under Application No. 5073 was included in the discovery materials at pages 000149-000156.

In his reply, Mark Cubie seems to take a different tack on the motion. Instead of arguing that there was a interception of communications (which is now readily apparent did not occur), he argues that there were insufficient grounds presented to Judge Goodstein to support the government's application for the § 2703(d) order (see 18 U.S.C. § 2703(d)), which order was issued by Judge Goodstein on April 12, 2005. Specifically, Mark Cubie argues that the government's April 12, 2005 application for the § 2703(d) order relating to telephone number 414-460-5638 fails to set forth "specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation" as required by 18 U.S.C. § 2703(d). (Mark Cubie's Reply at 2, dkt. 176.) In this case, the "records or other information sought" included the numbers dialed, the incoming numbers if identified, the call durations, and the subscriber and billing information for (414) 460-5638.

First of all, Cubie's new argument should be disregarded since it was not presented in his original memorandum in support of the motion. However, even if the court were to consider Cubie's new argument, such argument would be rejected.

25

In his application for the § 2703(d) order, Assistant United States Attorney Daniel Sanders stated, *inter alia*, the following:

> 2. The Milwaukee High Intensity Drug Trafficking Area (HIDTA) and the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) are conducting a criminal investigation of violations of Title 21 U.S.C. § 846, conspiracy to distribute controlled substances. There are reasonable grounds to believe that the requested tele-communications records are relevant and material to the ongoing criminal investigation as demonstrated below.
>
> a. During the past weeks, case agents from HIDTA and DCI have been monitoring the cellular telephone number, (414) 460-1716, used by suspected drug trafficker Mark A. Cubie. During the same time period, a confidential informant who purchased ½ kilogram of cocaine from Cubie on January 28, 2005, under the direction and control of case agents, contacted case agents and informed them that Cubie changed his cellular telephone number. The informant, under the direction and control of case agents, called Cubie at (414) 460-1716 and left a message for Cubie to call. A short time later, an unknown female called the informant and told the informant that Cubie no longer used (414) 460-1716 and that she would pass the message on to Cubie.
>
> b. An analysis of the telephone records pertaining to the most commonly and frequently called numbers to (414) 460-1716 over a two month period indicates that at the time the informant left the above-described message, (414) 460-5638 began to call the most common and frequently called numbers associated with (414) 460-1716. Telephone records indicate that (414) 460-5638 is a pre-paid number through a Sprint re-seller with no subscriber listed, just as (414) 460-1716 was during its use and operation by Cubie during the past several months.

(2703(d) App. No. 5073 at ¶ 2 (attached to Mark Cubie's Mot.), dkt. 134.) Simply stated, what the foregoing reasonably demonstrates is that Mark Cubie, who had been engaging in drug trafficking with at least one confidential informant, stopped using one cell phone and started using another cell phone sometime between January 28, 2005 (the date of the drug sale to the informant) and the "past weeks" leading up to April 12, 2005. It further reasonably demonstrates that the number of the new cell phone being used by Cubie was (414) 460-5638. Such being the case, AUSA Sanders' application does set forth "specific and articulable facts showing that there [were] reasonable

26

grounds to believe that . . . the records or other information sought, [were] relevant and material to an ongoing criminal investigation" in accordance with 18 U.S.C. § 2703(d).

The bottom line is that Mark Cubie's motion to suppress evidence is ill-founded precisely because the telephone historical information set forth in paragraphs 61 and 73 of the Intercept Application was obtained by valid court order. In light of the foregoing, it will be recommended that Mark Cubie's Motion to Suppress Title III Wire Intercepts be denied.

**B. Motions to Suppress Evidence Seized Pursuant to Searches/Stops/Vehicle "Data Loader"**

**1. Mark Cubie's "Motion to Suppress the Evidence Recovered During the Execution of the Search Warrant at the Defendant's Residence"**

Defendant Mark Cubie has filed a motion

> for an Order suppressing all evidence obtained during the execution of a May 16, 2005 search warrant at the defendant's residence, located at 5634 West Oklahoma Avenue, Milwaukee, Wisconsin, on the grounds that there did not exist probable cause to issue the search warrants for the subject residence and storage facility and the "good faith" exception does not apply.

(Mot. at 1, dkt 131.) Mark Cubie argues that

> [b]ased on the limited evidence, in the application, of any connection between Mr. Cubie and the subject residence, there was no reasonable basis to suspect that Mr. Cubie resided at 5634 W. Oklahoma Ave. Further, assuming *arguendo* that Mr. Cubie was properly identified as residing at 5634 W. Oklahoma Ave., there was no reason to believe that evidence of any crime would be found at the residence on May 16, 2005 (the date the warrant was signed).

(Mot. at 3.) Mark Cubie further argues in his reply that

> [t]he affidavit failed to establish that Cubie lived at the apartment at any identifiable time near the execution of the search warrant on May 16, 2005. The affidavit only established that: a) On January 28, 2005 (nearly 4 months before the execution of the search warrant), agents followed Cubie to 5634 West Oklahoma. They found his car there, and the apartment manager told them that Cubie lived in Apartment 124. See Affidavit ¶ 21. That was sufficient to establish that Cubie probably lived at the apartment in January, 2005; but, not in May, 2005.

27

(Reply at 1, dkt. 175.) In other words, Mark Cubie's motion to suppress, at its heart, is predicated on the proposition that the affidavit in support of the warrant failed to establish probable cause to believe that on May 16, 2005, Cubie resided at 5634 W. Oklahoma Avenue. Such being the case, according to Mark Cubie, the application failed to establish probable cause to believe that evidence of Mark Cubie's drug dealing would be found at that address on May 16, 2005.

The government disagrees. More specifically, in support of the position that there was probable cause to believe that Cubie lived at that location on May 16, 2005, the government argues as follows:

> On January 28, 2005, agents followed Cubie to 5634 West Oklahoma. They found his car there, and the apartment manager told them that Cubie lived in Apartment 124. See Affidavit ¶ 21. That was sufficient to establish that Cubie probably lived at the apartment. In addition, the affidavit established that GPS information placed Cubie at the apartment building regularly, and surveillance agents observed him there on at least one other occasion. All of this evidence was sufficient for the magistrate judge to conclude that the apartment was Cubie's residence.

(Gov't Resp. at 9, dkt. 167.)

Probable cause is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Probable cause exists when it is reasonably believed that the evidence sought will aid in the prosecution of a particular offense and the evidence is located in the place to be searched. *See United States v. Lloyd,* 71 F.3d 1256, 1263 (7th Cir. 1995); *United States v. Ellery,* 678 F.2d 674, 677 (7th Cir. 1982); *United States v. Anton,* 633 F.2d 1252, 1254 (7th Cir. 1980). "Probable cause denotes more than mere suspicion, but does not require certainty." *United States v. McNeese,* 901 F.2d 585, 592 (7th Cir. 1990) (quoting *Ellery*, 678 F.2d at 677.) "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday

28

life on which reasonable and prudent men, not legal technicians, act." *United States v. Kimberlin,* 805 F.2d 210, 228 (7th Cir. 1986) (quoting *Brinegar v. United States,* 338 U.S. 160, 175 (1949)).

Probable cause is a fluid concept turning on the assessment of probabilities in a particular factual context. "Rather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the magistrate." *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993). A search warrant may issue even in the absence of direct evidence linking criminal objects to a particular site. *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995). "The [judicial officer] to whom the warrant application is directed 'is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense,' and the [judicial officer] 'need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" *Id.* (quoting *United Sates v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990)).

A judicial preference is to be accorded warrants in those cases where there is a close or marginal showing of probable cause. In reviewing prior probable cause findings made by a judicial officer in issuing a warrant, "great deference" is to be accorded to that determination. *United States v. Leon*, 468 U.S. 897, 914 (1984). The duty of the reviewing court is simply to ensure that the judicial officer issuing the warrant had a substantial basis for concluding that, under the totality of the circumstances, probable cause existed to believe the contraband or evidence of the crime sought will be found in a particular place. *Gates*, 462 U.S. at 236. The Seventh Circuit has held that the standard of review of a determination that probable cause exists supporting issuance of a search warrant is "one of affirmance absent clear error by the issuing magistrate." *United States v. Pless*, 982 F.2d 1118, 1124 (7th Cir. 1992).

29

Given the foregoing, this court's duty is limited to deciding whether Magistrate Judge Goodstein had a substantial basis for concluding that on May 16, 2005, under the totality of the circumstances, probable cause existed to believe that evidence of Mark Cubie's drug dealing (more precisely the items identified in the attachment to the search warrant) would be found at 5634 West Oklahoma Avenue. *Gates*, 462 U.S. at 236. Applying that standard of review, I am satisfied that Judge Goodstein had a substantial basis for so concluding. Therefore, it will be recommended that Mark Cubie's motion to suppress be denied.

That the search warrant application demonstrates probable cause to believe that Mark Cubie was a drug dealer in 2004 and 2005 is beyond argument. That is undoubtedly the reason why Mark Cubie has not challenged the warrant on that ground. Indeed, the affidavit recounts Mark Cubie's drug activities through the information provided by three confidential informants, at least one of whom (CI-3) made a controlled purchase of ½ kilogram of cocaine from Mark Cubie on January 28, 2005. (Aff. at ¶¶ 9- 21(Case No. 05-M-74).)[1] The affidavit also recounts a meeting between CI-3 and Mark Cubie on February 2, 2005, which meeting was recorded. During the meeting, CI-3 paid Mark Cubie $5,000.00 in recorded buy money. "During the recorded meeting, Cubie told CI-3 that he would have more cocaine within a couple days and that he expected CI-3 to pay the remainder of CI-3's drug debt at that time." (Aff. at ¶ 26.)

Thereafter, the affidavit recounts a series of events which suggested Mark Cubie's continued drug distribution activities, including the collection of money from customers. More significantly,

---

[1] The search warrant and affidavit from Case No. 05-M-74 have yet to be docketed in this case. The court will therefore include a paper copy of such with this Recommendation and Order.

certain drug-related conversations of Mark Cubie were captured on the wiretap into late April and early May, 2005. According to the affidavit,

48. On April 27, 2005, monitoring of target telephone #1 and surveillance of Cubie established that Cubie spent the day collecting money from persons that he distributed drugs to during the past several days and was planning a trip to New York City on Thursday, April 28, 2005. . . .

49. From April 28-30, 2005, monitoring and surveillance established that Mark Cubie and Ronald Q. Terry were in New York City. There was relatively little contact between Cubie over target telephone #1 and Nicksion at target telephone #2 and Lopez at target telephone #3.

. . . .

51. On May 1, 2005, monitoring and surveillance established that Cubie returned from New York City and began to collect money for drug debts and arrange a cocaine transaction with Lopez for later in the week. . . .

52. On May 2, 2005, monitoring and surveillance established that Cubie was still collecting money and making arrangements with Lopez for a future drug deal. . . .

53. On May 3, 2005, monitoring and surveillance established that Cubie collected most of the money that he owed to Lopez and agreed to meet with Lopez in Chicago to pay Lopez the money and received additional kilograms of cocaine form Lopez. . . .

54. On May 4, 2005, monitoring and surveillance established that Cubie delivered money to Lopez the day before and that Cubie received cocaine during the same trip. Monitoring and surveillance also established that Cubie distributed the cocaine that he received from Lopez and was again making arrangements with Lopez to receive additional amounts of cocaine. Eventually, Cubie took money to Lopez in Chicago and obtained approximately 10–12 kilograms of cocaine. . . .

55. From May 5-10, 2005, monitoring and surveillance established that Cubie was trying to collect the money owed to Lopez for the drug deal that took place on May 4, 2005. Cubie also began to make arrangements with Lopez and others to obtain an additional amount of cocaine on May 11 or 12, 2005. . . .

56. From May 10-16, monitoring and surveillance established that Cubie was collecting money from his most recent shipment of cocaine. Cubie was in regular and

31

frequent contact with Nicksion, Terry, Burke, Delano Hill, Edward Cubie, and his source of supply, Jose Lopez. Cubie was collecting the money in order to pay his source and acquire additional amounts of cocaine. On May 12, 2005, Cubie was notified that someone stole money form his stash house at 2945 N. 53rd St., Milwaukee WI. From May 12 until May 16, 2005, Cubie, Nicksion, Terry, Burke, Hill, Bridges, Long and others had numerous conversations about the stolen money. By May 16, 2005, Cubie, Nicksion, and Terry concluded that Jan Long and Robert Bridges were responsible for the stolen money and planned to harm Long and Bridges. Long owns the duplex at 2945 N. 53rd St.

(Aff. at ¶¶ 48-49, 51-56.)

Moreover, as late as 4:30 p.m. on April 28, 2005, (the day that Mark Cubie was seen collecting drug money from his customers), Mark Cubie was seen (along with Anthony Burke) entering the apartment building located at 5634 W. Oklahoma Avenue. "Cubie was carrying the same black brief case that had cocaine, crack, marijuana, and cash in it when Cubie was arrested on February 2, 2005." (Aff. at ¶ 48.) Now, was it just coincidental that on April 28, 2005, Mark Cubie and Burke were seen entering the same apartment building in which Mark Cubie had been known to have an apartment a mere three months earlier? Of course, that is possible; but it is not likely. To the contrary, application of common sense leads to the reasonable conclusion that as of April 28, 2005, Mark Cubie still lived in the same apartment in which he was known to live on January 28, 2005. Such being the case, Judge Goodstein had a substantial basis for concluding that, under the totality of the circumstances, probable cause existed to believe contraband or evidence of the crimes sought would be found in Mark Cubie's apartment in May, 2005. *Gates*, 462 U.S. at 236. Consequently, and in light of the foregoing, it will be recommended that Mark Cubie's Motion to Suppress be denied.

32

**2. Mark Cubie's Motion to Suppress Evidence Seized During a Traffic Stop on February 2, 2005.**

Mark Cubie (referred to as "Cubie" in this section) has filed a motion to suppress evidence seized during the course of a traffic stop of an automobile that he was driving on February 2, 2005. On December 27, 2005, an evidentiary hearing was conducted with respect to such motion. There were four witnesses who testified at the hearing: Milwaukee Police Officers Brian Brosseau ("Brosseau") and Dennis DeValkenaere ("DeValkenaere"); Milwaukee Police Detective Kenneth Smith ("Smith"); and Donald Buchanan ("Buchanan"). The following is a summary of the testimony given at the hearing.

**a. The Hearing**

Brosseau testified that, as of February, 2005, he had been a Milwaukee Police Officer for four and one-half years. At that time he was assigned to the Warrant Squad, Intelligence Division. On February 5, 2005, he and his partner, DeValkenaere, were told by Detective Smith that he and other law enforcement officers had been following a vehicle and had observed numerous drug transactions that day. Smith described the vehicle for Brosseau. Specifically, Smith told them that Smith and other officers had observed a drug transaction at the parking lot on 76th and Mill Road and that the vehicle was heading eastbound on Mill Road. Smith also told Brosseau that the vehicle might have a trap compartment in it. Smith also told Brosseau that they had observed a white object be thrown into the vehicle and they did not know if it was narcotics. Smith also told Brosseau that "they had given a payment for narcotics to Mr. Cubie," although Brosseau could not recall if Smith told him that it was a confidential informant who had made the payment to Cubie. (Tr. at 27.) (all citations to Tr. in this section refer to the transcript of the December 27, 2005 evidentiary hearing,

33

dkt. 199) Brosseau received this information at approximately 6:00 p.m. Smith requested that Brosseau and DeValkenaere make a traffic stop of the identified vehicle.

Brosseau testified that as he pulled up behind the vehicle as both were traveling in an easterly direction in the far right lane of Mill Road, the driver hit his brakes and turned to the left "rather quickly." (Tr. at 12.) According to Brosseau, "[h]is vehicle was positioned in front. Our vehicle was behind him, at which time he hit the brakes and made an abrupt left turn, causing myself to lock up our brakes so we wouldn't rear end him." (Tr. at 13.) By driving in such a fashion the driver of the vehicle committed a traffic violation, to wit, "[d]eviation from lane," which is "[c]hanging lanes without a signal, in an abrupt manner." (Tr. at 13.) As it changed lanes, the vehicle did not use its turn signal. At that point Brosseau activated his emergency lights and siren. The driver of the vehicle pulled over to the right side of the road and stopped. Brosseau and DeValkenaere exited their unmarked squad car and approached the vehicle. Both officers were wearing their uniforms. Brosseau approached the driver, who was Mark Cubie. Brosseau told Cubie that he had been pulled over for causing the officers to almost rear end him. He asked Cubie for his license and Cubie retrieved his license from a black leather briefcase that was located behind the passenger seat. Cubie was ultimately issued a ticket for the abrupt lane change. The citation was received into evidence as Government's Exhibit 2.

After Cubie gave Brosseau his license, Brosseau asked Cubie to exit the vehicle. Brosseau asked Cubie to get out of the car because of the information he had received concerning Cubie's drug activities seen earlier by Smith. Brosseau testified, "[w]hen people deal with narcotics, they're generally armed. And just for the Officer's safety, rather have him step out of the vehicle so that no

34

one is going to get injured." (Tr. at 19.)  The passenger, Donald Buchanan, was also asked to get out of the vehicle.  Both Cubie and Buchanan were taken to the rear of the vehicle.

At that point, DeValkenaere asked if the officers could search the vehicle and Cubie said, "Yes. Go ahead." (Tr. at 20.)  At that point in time Cubie's demeanor was calm.  Brosseau's and DeValkenaere's sidearms were holstered.  Brosseau was not yelling at Cubie in any way. DeValkenaere's demeanor when he asked Cubie for permission to search the vehicle was also calm. Prior to the officers' asking Cubie for permission to search his vehicle, Cubie was neither advised that he was under investigation for narcotics trafficking nor advised of his *Miranda* rights.  (Tr. at 38; 40)   Nor did Brosseau ask Cubie for permission to search any of the containers located within Cubie's vehicle.  (Tr. at 38.)  At the time the search of the vehicle was conducted Brosseau did not have any reason to believe that the black leather bag contained anything other than Cubie's driver's license.  (Tr. at 39.)

Brosseau searched the vehicle by first looking in the center console.  There he found a .22 caliber pistol.  At that point he motioned to DeValkenaere that he had found a pistol.  Brosseau then returned to the rear of the vehicle and DeValkenaere placed both Cubie and Buchanan in handcuffs. Brosseau had not removed the pistol from the console at that point, but "Cubie stated that he had got shot, and that's why he carries that."  (Tr. at 24.)  In response to Cubie's remark, Brosseau "asked carried what? He said that little .22." (Tr. at 25.)

Subsequently, DeValkenaere continued the search of the vehicle.  In the black leather bag from  which Cubie had retrieved his license the officers found some marijuana and some cocaine. The drug transaction at 76th and Mill Road would have occurred approximately 20 minutes before the vehicle was stopped.  (Tr. at 29.)

35

Detective Smith testified that he is a detective with the Milwaukee Police Department and that in February 2005 he was working with the HIDTA task force. At the end of January 2005, Smith and his partner came to know an informant who stated that he had purchased cocaine from Mark Cubie in the past. Prior to February 2, 2005, Smith had directed the informant to make controlled purchases of cocaine from Cubie. A controlled purchase of one-half kilogram of cocaine was made from Cubie on January 28, 2005. (Tr. at 56-58.)

Subsequent arrangements were made between the informant and Cubie to have the informant meet with Cubie and pay Cubie an additional $5,000 for the prior ½ kilogram of cocaine. That payment was made on February 2, 2005 at approximately 1:30 or 2:00 p.m. (Tr. at 59, 61.) After the payment was made to Cubie on February 2, 2005, Cubie was under constant surveillance by law enforcement until he was ultimately stopped and arrested at approximately 8:00 p.m. During that period of time law enforcement officers observed Cubie make numerous stops and engage in activities which appeared to be drug transactions. (Tr. at 62-68, 72-76.)

At no time from January 28, 2005 to February 2, 2005, did Smith apply for and receive any arrest warrant for Cubie. (Tr. at 69.) Smith personally supervised the controlled buy involving the confidential informant on January 28, 2005. It was other officers who observed the transaction between Cubie and the confidential informant on February 2, 2005. (Tr. at 69-70.)

Donald Buchanan testified that on February 2, 2005 he was a passenger in Cubie's vehicle. As Cubie was taking him home, they were stopped by the police. According to Buchanan, Cubie never abruptly put his foot on the brake to stop; nor did he see Cubie swerve; nor did he see Cubie exceed the speed limit. According to Buchanan, prior to Cubie's being pulled over, Cubie was observing the rules of the road.

36

After they were pulled over, Buchanan was removed from the vehicle and placed at the rear of Cubie's vehicle. According to Buchanan, while he was being placed to the rear of Cubie's vehicle, Cubie remained in the driver's side, behind the wheel. Buchanan testified that he never heard Cubie give consent to the officers to search the vehicle. Indeed, Buchanan testified that he never saw the officers search the vehicle. Buchanan testified that he never saw the officers take Cubie out of the vehicle. (Tr. at 98.) According to Buchanan, at the time he was placed into the paddy wagon, Cubie was still in the vehicle. (Tr. at 98.)

The final witness was Dennis DeValkenaere. DeValkenaere has been a Milwaukee Police Officer for six and one-half years. He is currently on the Warrant Squad. On February 2, 2005, he was involved in the traffic stop of the vehicle being driven by Cubie.

DeValkenaere testified that he first saw Cubie's vehicle at the car wash at about 7:00 p.m. on February 2, 2005. The next time he saw it was when it was traveling eastbound on Mill Road. At that point in time they had already received a call to stop Cubie's vehicle "because of a suspected drug transaction that had just occurred." (Tr. at 107.)

Brosseau activated his lights and siren when Cubie's vehicle "made an abrupt lane change. Kind of like swerved off to the side into traffic. He slammed on his brakes. We nearly hit his - - rear end of his vehicle. At that point we conducted a traffic stop." (Tr. at 108.) According to DeValkenaere, Cubie "swerved to the south and then swerved back to the north." (Tr. at 109.) And then Cubie "depressed his brakes and [the officers] almost ran into the rear end of his car[.]" (Tr. at 110.) According to DeValkenaere, the officers had every intention of stopping Cubie "regardless of the driving, because of the transmission over the radio about - - from HIDTA." (Tr. at 110.)

37

After the vehicle was pulled over, DeValkenaere approached the passenger side and took the passenger out of the vehicle because "[h]e was moving around a lot in the vehicle. Made me suspicious. So I asked him to exit the vehicle." (Tr. at 110-111.) DeValkenaere conducted a pat-down search of the passenger. At this point, Cubie was still seated in the car and was talking to Brosseau. Brosseau removed Cubie from the vehicle about the time DeValkenaere was patting-down the passenger. Cubie was then brought to the rear of the vehicle. DeValkenaere testified that he believes Brosseau asked Cubie if he had permission to search his vehicle. (Tr. at 112.) This was as Cubie was standing at the rear of the vehicle. Brosseau searched the vehicle. After approximately a minute or two, Brosseau came out of the vehicle and motioned to DeValkenaere that there was a gun in the car. The two occupants were facing DeValkenaere so they were not able to see what Brosseau had motioned to DeValkenaere. (Tr. at 113-114.) Brosseau came back to the rear of the vehicle and placed handcuffs on Cubie. DeValkenaere placed handcuffs on the passenger. DeValkenaere then went to the car and searched it. DeValkenaere opened a black briefcase that was located in the back seat of the car and recovered some marijuana, cocaine, and some cash. He found additional cash in a white grocery bag which was under the driver's seat.

**b. Discussion**

Cubie argues that the stop of his vehicle was illegal for two reasons: first, the government failed to prove that a traffic violation had occurred; and second, there did not exist reasonable suspicion to stop his vehicle. Moreover, Cubie argues that there was no probable cause to search the vehicle. He also argues that any consent to search the vehicle was tainted by the illegal stop and therefore was a fruit of the illegal stop. Cubie further argues that any consent to search the vehicle which may have been given by him was not voluntary. Finally, Cubie argues that he should have

38

been advised of his *Miranda* rights prior to the officers' asking for his consent to search the vehicle. Because he was not advised of his *Miranda* rights, any consent which he may have given was illegally obtained. In the end, Cubie argues that the drugs, money and gun which were discovered during the search of his car were the product of an illegal search and should therefore be suppressed as evidence.

First of all, I am persuaded that Brosseau and DeValkenaere observed Cubie commit a traffic violation. I find them both to have been credible witnesses. To be sure, there was some minor inconsistency between Brosseau's and DeValkenaere's recounting of what they each observed Cubie do before he was pulled over. More precisely, Brosseau testified that Cubie swerved to the left while DeValkenaere testified that Cubie swerved to the right and then to the left. Either way, Cubie committed the lane deviation for which he received a citation.

By contrast, Buchanan testified that he never saw Cubie swerve or commit any traffic violation. Buchanan's demeanor on the witness stand was quite combative. Moreover, his recollection of the day's events prior to the officers' pulling over Cubie's vehicle was suspiciously vague. Simply stated, I find Buchanan less than credible as a witness.

But, even if I were to find that there was insufficient basis to pull Cubie over for a traffic violation, the fact remains that law enforcement had probable cause to take Cubie into custody on February 2, 2005. More precisely, law enforcement had probable cause to arrest him for drug distribution based, at a minimum, on the ½ kilogram of cocaine that Cubie had provided to the confidential informant five days earlier on January 28, 2005.

In order to have probable cause for an arrest, law enforcement agents must reasonably believe, in light of the facts and circumstances within their knowledge at the time of the arrest, that

39

the suspect had committed or was committing an offense. *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003). Moreover, "the police who actually make the arrest need not personally know all of the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (emphasis removed). Courts have applied the "collective knowledge doctrine" when information from one jurisdiction is actually relayed to offices or agencies in another jurisdiction to permit coordination of investigations and the speedy apprehension of fleeing suspects, *see United States v. Nafzger*, 974 F.2d 906, 910 (7th Cir. 1992), and when officers are in communication with each other while working at a scene. *Id*. at 912. In the second group of cases, the knowledge of the officers may be imputed to one another "even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed (though of course the information actually possessed by the officers must be sufficient to justify the stop or arrest)." *Id*. at 911.

   As set forth above, there was more than sufficient probable cause to stop and arrest Cubie on the evening of February 2, 2005. Indeed, law enforcement had made a controlled buy of ½ kilogram of cocaine from him a mere five (5) days earlier. Additionally, law enforcement had made a controlled drug payment of $5,000 to him on the very day of the vehicle stop.

   Once Cubie's vehicle was stopped and Cubie was removed from the vehicle, the officers were justified in searching the passenger compartment and any containers in it. *New York v. Belton*, 453 U.S. 454, 461-62 (1981) (search of a jacket on the floor of car valid as incident to arrest); *see also United States v. Richardson*, 121 F.3d 1051, 1056-57 (7th Cir. 1997) (search of contents of passenger

compartment of car and containers found within it valid as incident to arrest). "Under *Belton*, a 'container' is 'any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like.'" *Id*. at 1056 (quoting *Belton*, 453 U.S. at 460-61 n.4). It thus follows that the discovery and seizure of Cubie's firearm, which was in the console next to the driver's seat, were legal.

Given the foregoing, it is not necessary to decide whether Cubie's consent to search the vehicle was voluntarily given. Nevertheless, in the interest of completeness I will address that issue.

> The Fourth Amendment's prohibition against warrantless searches does not apply when law enforcement officials receive voluntary consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Grap*, 403 F.3d 439, 442 (7th Cir. 2005). The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Grap*, 403 F.3d at 442. Whether consent is voluntary is a question of fact dependent upon the totality of the circumstances. *Schneckloth*, 412 U.S. at 227; *Grap*, 403 F.3d at 442.

*United States v. Sandoval-Vasquez*, __ F.3d __, 2006 WL 176981 at *4 (7th Cir. 2006).

Factors which a court is to consider in determining whether consent was voluntary include: (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent. *Id*. (citing *United States v. Santiago*, 428 F.3d 699, 704 (7th Cir. 2005)). Applying these factors to the facts in this case leads me to conclude that Cubie's consent to search the vehicle was voluntarily given.

41

Indeed, the uncontradicted evidence is that at the time Cubie (who is an adult) gave his consent he was not handcuffed and his demeanor was "calm." Nor at that point had the officers removed their firearms from their holsters. Cubie gave his consent immediately upon being asked for consent to search his vehicle and within minutes of his vehicle's being pulled over. And there is no evidence that he was threatened or treated harshly in any respect prior to his giving consent. The bottom line is that, regardless of whether the officers had probable cause to arrest Cubie, they had reasonable cause to pull him over for a traffic violation. And, once he was pulled over for the traffic violation, he gave the officers voluntary consent to search his vehicle.[2]

In conclusion, and for all of the foregoing reasons, it will be recommended that Cubie's motion to suppress evidence seized during the course of a traffic stop of an automobile that he was driving on February 2, 2005 (dkt. 126) be denied.

### 3. Nicksion's "Motion to Suppress Fruits of Search at 8666 S. Chicago Avenue, Oak Creek, Wisconsin"

Nicksion has filed a motion

[t]o suppress all evidence seized from Orlandes Nicksion's apartment on May 16th, 2005 for the reason that the affidavit filed in support of the application for the search warrant fails to establish probable cause to believe that contraband would be found in Nicksion's apartment on that date.

---

[2] In his reply Cubie argues that he should have been advised of his *Miranda* rights prior to being asked for consent to search his car. More precisely, he asserts that the officers "should be prohibited from purposefully hiding the 'actual' reason for the stop, and disguising it as a routine traffic stop, for the purpose of eliciting incriminating information from custodial interrogation, that includes alleged consent to search his car." (Reply at 4, dkt. 207.)

Cubie's argument must be rejected. *Miranda* warnings are required only when a suspect is in custody and is being interrogated. Asking a suspect for consent to search his car does not constitute interrogation for *Miranda* purposes. *United States v. LaGrone*, 43 F.3d 332, 335 (7th Cir. 1994) (no interrogation when police asked suspected drug dealer for permission to search store); *United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994) (no interrogation when officers asked defendant's permission to search truck).

(Nicksion's Mot. at 3, dkt 117.)  According to Nicksion,

> [t]o put it bluntly, the affidavit alleges that, based upon two year-old information from a CI that Nicksion may have dealt drugs in the past; that Cubie was presently dealing drugs in the Milwaukee area; that Cubie and Nicksion knew on another and had contact with each other; and that Nicksion may have suggested he could buy two kilograms of cocaine from Cubie but, on that same occasion when Cubie specifically asked Nicksion to help (i.e. to drive the car), Nicksion declined.

(Nicksion's Mot. at 12.)  In Nicksion's view, this meager information (which is a summary of the information that he claims is set forth in the affidavit) was insufficient to support the issuance of a search warrant for his residence on May 16, 2005.

To be sure, the CI ("CI-1" ) information set forth in the affidavit does relate to a period of time 2 to 3 years before the warrant was issued, i.e., 2002-2003 (Aff. at ¶¶ 9-13 (Case No. 05-M-75), dkt. 117-4.)  And if this were all that had been provided to the issuing judicial officer (Magistrate Judge Goodstein), Nicksion's position might find firm footing.  But, that is not all that is presented in the affidavit.  Indeed, there is much more.

First of all, surveillance on February 2, 2005, established that Mark Cubie (who is shown by the affidavit to be a significant drug dealer) was collecting drug debts.  During the course of his doing so, Mark Cubie went to the post office and wrote out a mailing label for "Cristela Nicksion" at the same Florida address as was found in the subscriber information for Nicksion's cellular number.  Mark Cubie purchased $2,000 in money orders using cash, and used a false name in the return address.  (Aff. at ¶ 34.)  It is not unreasonable to conclude that Cubie might be sending a portion of the drug proceeds to Nicksion.  Recall that CI-1 had told the authorities that sometime after July 2002, "Nicksion began selling cocaine with Mark Cubie."  (Aff. at ¶ 11.)

43

The affidavit also describes Nicksion's dealings with Mark Cubie on March 30, 2005. Specifically, both Mark Cubie and Nicksion's cellular telephones were operated in the Chicago area during the afternoon of March 30, 2005. This is noteworthy because their source of supply for their drugs had been identified as being from Chicago. (Aff. at ¶¶ 11, 22.) Mark Cubie and Nicksion were eventually surveilled arriving in the parking lot at 8666 S. Chicago Drive and parking their vehicle approximately 10 feet from apartment 13, which was Nicksion's apartment. (*See* Aff. at ¶ 36.) At that point,

> Case agents observed Nicksion exit the driver's side of the van and Cubie exit the passenger's side. Cubie walked into Apt. 13 carrying a black leather briefcase, similar to the one he had on February 2, 2005 and as seen in other surveillance prior to this date.

> A short time later, Cubie exited the apartment and opened the back of the van. Cubie then retrieved a large dark blue duffle bag that appeared to the case agents to [be] 3-4 feet in length and 18 inches in diameter. Case agents observed Cubie carry the duffle bag, hanging in front of him and using two hands and his knee, to the rear of Nicksion's Buick Regal parked nearby. Based on the agents' observations and Cubie's actions, it appeared to the case agents that the duffle bag was full and heavy.

> Cubie opened the trunk of the Buick Regal and then opened the duffle bag on the ground. Cubie appeared to be moving items around in the duffle bag. He then took some of the items out of the duffle bag and placed them in the tire well, under the spare tire, in the trunk of the Buick Regal. Cubie then place the whole duffle bag in the trunk and closed the trunk.

> At 4:43 p.m., Cubie parked the Buick Regal in front of 3867 N. 24th Place and a black male about 5'9" and medium build, wearing a baseball cap, exited 3867 N. 24th Place and met Cubie at the trunk of the Buick Regal. Cubie opened the trunk, retrieved the above-described blue duffle bag, and walked with it towards the side door at 3867 N. 24th Place. Case agents observed that Cubie was having a hard time carrying it, as if it was heavy.

> At 4:57 p.m., Cubie returned to the Buick Regal and another black male carried an unknown item wrapped in a white plastic bag into the residence. Cubie entered the vehicle and drove from the area.

44

Case agents followed Cubie to an Office Max store in the area. At 5:20 p.m., Cubie exited the store carrying a shopping bag. He walked to the Buick Regal, dropped the bag inside the car, and then walked to a Walgreen's store located in the same parking lot.

At 5:27 p.m., Cubie exited the Walgreen's store, entered the Buick Regal, and then drove through a McDonald's drive-through. Cubie left McDonald's at 5:45 p.m. and drove to the vicinity of the 3900 Block of N. 9th Street and N. 10th Street. Surveillance was terminated for fear that Cubie would spot law enforcement.

Case agents went back to the Office Max store and determined that Cubie had just purchased an electronic Pelouze Postal scale, Model SP5, which weighs items from one gram to 5 pounds. The scale costs $32.97. Case agents obtained a copy of the register receipt for the transaction, as well as a video tape showing Cubie purchasing the scale.

(Aff. at ¶ 42.) As the government aptly observes,

[t]hese activities, when viewed in total and by an experienced law enforcement agent, describe much more than conjecture or guess-work. Instead, they establish probable cause to believe that Cubie and Nicksion had obtained a load of cocaine from Chicago, Cubie stashed at least a portion of it in Nicksion's vehicle, took it to a stash house, and then needed a scale in order to begin repackaging the cocaine for distribution.

(Gov't's Resp. at 13, dkt 167.) Even more significantly, paragraphs 47 and 48 of the affidavit describe a number of intercepted conversations among Mark Cubie, Nicksion, and Lopez. Those conversations paint a picture of Mark Cubie's wanting to meet with Lopez to pay money and to obtain more drugs. Indeed, at 9:52 p.m., on April 26, 2005,

Cubie and Nicksion talked about Cubie's meeting earlier with Lopez. Cubie complained about the quality of drugs that he got from Lopez. Cubie asked whether Nicksion would need one or two (kilograms) and Nicksion said whatever he could get. Cubie then told Nicksion that Cubie would try to hold on to it (drugs) for him. Nicksion replied that Cubie might as well. Nicksion told Cubie that he wouldn't be surprised if he needed it by tomorrow.

(Aff. at ¶ 47.) Paragraph 48 describes a conversation between Nicksion and Cubie (at 4:07 p.m.) during which the two discussed "how the outfits were moving. Nicksion said that the female was

45

moving them slowly but surely and said that he was going back over to 'Q's' (Ronald Q. Terry) house to 'wrap that shit (cocaine) up'. Cubie said they need to 'chop' it (mix the cocaine) up." (Aff. at ¶ 48.)

Paragraph 48 also describes an intercepted conversation between Cubie and an unidentified male (UM) at 11:45 p.m. on April 27, 2005. During the course of that conversation Cubie told the UM that he would have some cocaine the following week when he got back from out of town. He also told the UM that Orlando (Nicksion) would be relieving Cubie while Cubie was out of town. (Aff. at ¶ 48.)

> The UM asked whether Nicksion would be handling everything and Cubie said yes. The UM then asked when Nicksion planned to leave Milwaukee and Cubie said in a couple of weeks. The UM asked who would be taking over when Nicksion leaves and Cubie said that they would put something together then.

(Aff. at ¶ 48.) Paragraphs 51, 52 ,53 and 54 describe further telephone conversations on May 1, 2, 3, and 4, 2005, respectively, between Cubie and Nicksion during which drug distribution and money collection activities are discussed.

Paragraph 56 of the affidavit further states, in part, as follows:

> From May 10-16, monitoring and surveillance established that Cubie was collecting money from his most recent shipment of cocaine. Cubie was in regular and frequent contact with Nicksion, Terry, Burke, Delano Hill, Edward Cubie, and his source of supply, Jose Lopez. Cubie was collecting the money in order to pay his source and acquire additional amounts of cocaine. On May 12, 2005, Cubie was notified that someone stole money from his stash house at 2945 N. 53rd St., Milwaukee WI. From May 12 until May 16, 2005, Cubie, Nicksion, Terry, Burke, Hill, Bridges, Long and others had numerous conversations about the stolen money. By May 16, 2005, Cubie, Nicksion, and Terry concluded that Jan Long and Robert Bridges were responsible for the stolen money and planned to harm Long and Bridges.

(Aff. at ¶ 56.)

The bottom line is that the foregoing demonstrates probable cause to believe that Nicksion and Mark Cubie were in the drug distribution business together for some period of time, up through May 16, 2005. Such being the case, the affidavit provided more than sufficient reason to believe that evidence of such drug dealing would be found at Nicksion's residence at 8666 S. Chicago Drive, apt. 13. Stated another way, Magistrate Judge Goodstein had a substantial basis for concluding that, under the totality of the circumstances, probable cause existed to believe the contraband or evidence of drug dealing would be found at Nicksion's apartment. *Gates*, 462 U.S. at 236. Thus, it will be recommended that Nicksion's "Motion to Suppress Fruits of Search at 8666 S. Chicago Avenue, Oak Creek, Wisconsin" be denied.

**4. Nicksion's "Motion to Suppress All Information Garnered from the 'Data Loader' Installed on Nicksion's Vehicle on April 26th, 2005"**

Nicksion has filed a motion challenging the legality of the government's warrantless placement of a "Sentinel Data Loader Tracking Device" (hereinafter "global positioning device" or "GPS device" or "tracking device") on his automobile on April 26, 2005, while it was parked in the parking lot associated with the apartment building in which he resided. An evidentiary hearing was conducted in connection with his motion on November 17, 2005. The only government witness to testify at the hearing was DEA Task Force Agent Steve Wellens ("Wellens"). The defendant, Orlandes Nicksion, also testified.

According to Wellens, during the early morning hours of April 26, 2005 (i.e., 4:00 a.m.), other law enforcement officers and he went to Nicksion's apartment complex and observed Nicksion's 1998 Buick Regal parked on the east side of the parking lot where they had previously seen the vehicle parked. Wellens described the parking lot as a multi-space lot with no gates or

47

obstructions to prevent anyone from entering the lot. There were no posted signs limiting access to the lot either at the entrance to the lot or anywhere else. Exhibit 5 is a photograph of the parking lot. According to Wellens, the law enforcement officers entered the east entrance of the parking lot from Puetz Road, proceeded to Nicksion's vehicle, and attached a GPS device to the undercarriage of Nicksion's vehicle. The officers did not open the door, hood, or trunk of the vehicle in order to install the GPS device. Nor was the vehicle altered in any way during the installation of the GPS device.

Nicksion essentially testified to the effect that he had a subjective expectation of privacy with respect to his automobile while it was parked in the apartment parking lot. More precisely, he testified that he did not expect members of the public to wander the parking lot. This is because those who do not live in the apartment complex are not supposed to park in the parking lot, where the tenants have assigned parking spaces. Instead, those who do not live in the apartment complex are supposed to park their vehicles on the street.

Nicksion attacks the government's actions on several fronts. First, he argues that installation of the GPS device on his vehicle violated his Fourth Amendment rights because there was neither reasonable suspicion nor probable cause to believe that Nicksion was using his vehicle to commit a crime. In that connection, Nicksion asserts that "18 U.S.C. § 3117 contemplates that under most circumstances judicial authorization is required before government agents may affix a GPS device to a person's automobile." (Nicksion's Mot. at 7, dkt. 117.) Furthermore, Nicksion argues that, even if use (and installation) of the GPS would have otherwise been reasonable, the agents violated the curtilage of his residence when they (without a warrant) installed the device on his vehicle. Specifically, he asserts as follows:

48

[A]t the time the GPS device was affixed to Nicksion's car it was parked in the lot associated with his apartment building. The lot was for the use of the tenants only. Although the public is not entirely excluded from the lot, the public is not permitted to go onto the lot to place anything on the cars parked there. Thus, going onto the lot to affix the GPS device invaded Nicksion's curtilage and, for this reason, the court should suppress all evidence gathered through the use of the GPS device.

(Nicksion's Mot. at 8.) "The question is whether Nicksion had a privacy interest in his vehicle at the time it was parked on his curtilage and whether this is [a] privacy interest which society is prepared to accept." (Nicksion's Mot. at 9.)

Title 18 U.S.C. § 3117 reads as follows:

**(a) In general.** If a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of that device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction.

**(b) Definition.** As used in this section, the term "tracking device" means an electronic or mechanical device which permits the tracking of the movement of a person or object.

To the extent that Nicksion reads § 3117 to always require the issuance of a search warrant before installation of a tracking device, his reading of that statute is incorrect. Under Fourth Amendment analysis, "the Government needs a search warrant only when the installation process invades a protected privacy interest of a specific individual. . . . No search warrant is needed for installation if the public and the police have lawful access to the property or the vehicle." James A. Adams, *Electronic Tracking and Thermal Imaging Devices, Generally*, National Institute for Trial Advocacy Commentary, 18 US NITA § 3117 (2005). Section 3117 merely makes clear that, when a court does issue an order for the installation of a tracking device (because installation would otherwise invade a protected privacy interest of an individual and therefore an order is required), that

49

order may include a provision calling for the monitoring of the device outside the territorial jurisdiction of the issuing court.

And so the real question to be answered in Nicksion's case is whether the admittedly warrantless installation of the tracking device on Nicksion's automobile violated his Fourth Amendment rights, i.e., did the installation violate his reasonable expectation of privacy? The answer to that question is "no."

In *New York v. Class*, 475 U.S. 106 (1984), the Supreme Court held that there is no reasonable expectation of privacy in the exterior to an automobile because "[t]he exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *Id.* at 114. In *Class*, the officer's conduct in opening the door of the respondent's car to move papers that obscured the vehicle's identification number ("VIN") located on the dashboard was held not to violate the Fourth Amendment. However, with respect to the VIN itself, the court reasoned that "[t]he VIN's mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment." *Id.* Relying in part on the Supreme Court's decision in *Class,* the Tenth Circuit held in *United States v. Rascon-Ortiz*, 994 F.2d 749 (10th Cir. 1993), that "[t]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy." *Id.* at 754. In *Rascon-Ortiz* an officer "knelt down and looked under the car with a flashlight." *Id.* at 750.

In the instant case, the agents placed a tracking device onto the undercarriage of Nicksion's car. In doing so, they no doubt peered at the undercarriage. But, given the holdings in *Class* and *Rascon-Ortiz*, such action the part of the agents did not violate Nicksion's Fourth Amendment rights. Simply stated, Nicksion had no reasonable expectation of privacy with respect to the undercarriage

50

of his car and therefore the agents' looking at it did not constitute a search. *See also United States v. McIver*, 186 F.3d 1119, 1126-27 (9th Cir. 1999) (Warrantless installation of GPS tracker was proper because defendant never proved that he intended to preserve the vehicle's undercarriage as private); *United States v. Strmel*, 574 F. Supp. 793, 802 (E.D. La. 1983) ("[W]arrantless installation of a beeper on the outside of a vehicle does not violate the Fourth Amendment since the expectation of privacy is low and the intrusiveness is not great.").

Moreover, that they placed a tracking device onto the undercarriage did not constitute a "seizure" of the vehicle within the meaning of the Fourth Amendment. This is clear from the Supreme Court's holding in *United States v. Karo*, 468 U.S. 705 (1984). In *Karo* the court upheld the placement of a tracking device in a can containing materials needed for making controlled substances. In rejecting the notion that doing so constituted a seizure of property, the court stated;

> A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." Although the can may have contained an unknown and unwanted foreign object, it cannot be said that anyone's possessory interest was interfered with in a meaningful way. At most, there was a technical trespass on the space occupied by the beeper. The existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, however, for an actual trespass is neither necessary nor sufficient to establish a constitutional violation.

*Id*. (internal citation omitted).

But what about the agents' entry onto the parking lot to install the tracking device? Did such entry constitute a search, to wit, a violation of Nicksion's reasonable expectation privacy? Once again, case law dictates that the answer to that question is "no." In its brief, the government sets forth a litany of cases which, in the context of apartment buildings and common parking lots, elaborate on the general principle that "[w]hat a person knowingly exposes to the public, even in his

51

or her own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). That litany of case includes the following: *United States v. Boden*, 854 F.2d 983, 990 (7th Cir. 1988) (holding that a tenant had no expectation of privacy in the common areas of the building, including a storage area); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (holding that a defendant did not have a reasonable expectation of privacy in the hallway of an apartment building); *United States v. Clark*, 67 F.3d 1154, 1162 (5th Cir. 1995) (holding that a tenant has no reasonable expectation of privacy in a common stairway or walkway of an apartment building); *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994) (holding that motel guests had no reasonable expectation of privacy in motel parking lot); and *United States v. Dickens*, 695 F.2d 765, 778 (3d Cir. 1982) (holding that a person has no reasonable expectation of privacy in a staircase accessible to other tenants of the building).

The evidence at the evidentiary hearing made clear that the lot in which Nicksion's car was parked at the time the agents installed the tracking device was a common parking lot. To be sure, the lot may have been intended for the use of tenants of the building and not necessarily for the use of third parties. But, the same could be said for an apartment's interior hallway. Yet, as noted above, the courts have consistently held that a tenant does not have a reasonable expectation of privacy in such common hallways. Accordingly, even assuming that Nicksion subjectively had an expectation of privacy with respect to the exterior of his automobile while it was parked in the common parking lot, such expectation was not objectively reasonable.

In sum, and for all of the foregoing reasons, it will be recommended that Nicksion's "Motion to Suppress All Information Garnered from the 'Data Loader' Installed on Nicksion's Vehicle on April 26th, 2005" be denied. Simply stated, neither the agents' entry on to the apartment building

parking lot nor their attaching the tracking device to Nicksion's automobile violated his Fourth Amendment rights. Furthermore, no court-ordered search or seizure warrant was required in order for them to legally do so.

**C. Motions for Severance**

Defendants Terry, Pigram, Lopez, Edward Cubie, Hill, and Nicksion have filed motions asking the court to sever their respective trial from the trials of the other defendants in this case. Charges against multiple defendants may be brought in a single indictment if the defendants are alleged to have participated in the same series of acts or transactions which constitutes the offense. Fed. R. Crim. P. 8(b). Here, that requirement is met because the indictment alleges that each of the named defendants participated in a conspiracy to distribute controlled substances. However, "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

Nevertheless, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (citations omitted). In fact, "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539. "In all but the 'most unusual circumstances,' the risk of prejudice arising from a joint trial is 'outweighed by the economies of single trial in which all facets of the crime can be explored once

53

and for all.'" *United States v. McClurge*, 311 F.3d 866, 871 (7th Cir. 2002) (quoting *United States v. Blassingame*, 197 F.3d 271, 286 (7th Cir. 1999)).  A defendant must show that failure to sever would result in a deprivation of his right to a fair trial; "it is insufficient that separate trials would have given a defendant a better opportunity for an acquittal."  *United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003) (citing *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir.2002)).  Stated another way, the movant has the burden of showing that failure to sever will result in actual prejudice.

The defendants' arguments for severance can be grouped into three categories: (1) that the defendant has need of a co-defendant's testimony which would be unavailable in a joint trial; (2) that co-defendants' out of court statements may be introduced at trial and present problems under *Bruton v. United States*, 391 U.S. 123 (1968); and (3) that there is a gross disparity in the evidence against the defendant compared to the co-defendants, and the related argument that the defendant will be found guilty by association.

## 1.  Need for Co-defendant Testimony

Defendants Pigram, Edward Cubie, Hill, and Nicksion all argue that their respective trials should be severed because if tried together they will be deprived of exculpatory testimony from their co-defendants.  "When a defendant requests a severance so that he can take advantage of exculpatory testimony from a co-defendant, the trial court should consider whether: (1) the codefendant's testimony would be exculpatory; (2) the co-defendant would in fact testify; (3) the testimony would bear on the defendant's case."  *United States v. Boykins*, 9 F.3d 1278, 1289 (7th Cir. 1993).  Moreover, a showing that a co-defendant <u>might</u> testify favorably at a separate trial is insufficient to warrant severance.  *United States v. Lopez*, 6 F.3d 1281, 1285 (7th Cir. 1993).

54

None of the defendants have made the requisite showing. Pigram admits that his motion to sever on this basis is premature, but has reason to believe that Mark Cubie could offer exculpatory testimony on his behalf. (Pigram's Mot. at 5, dkt. 123.) Likewise, Edward Cubie believes that Mark Cubie could offer exculpatory testimony on his behalf, but is unsure that Mark Cubie would be willing to so testify. (Edward Cubie's Mot. at 7, dkt. 119.) Hill argues only that testimony of unnamed co-defendants "may well be exculpatory." (Hill's Mot. at 5, dkt. 115.) Similarly, Nicksion simply states that "upon information and belief, none of the codefendants could truthfully testify that they ever worked with Nicksion in distributing cocaine. As such, the testimony of all of the codefendants is exculpatory." (Nicksion's Mot. at 23, dkt. 117.)

Furthermore, Terry argues that his trial should be severed because he needs to cross-examine co-defendants regarding recorded conversations in which they speak and which are likely to be introduced as evidence at trial. Terry does not frame his argument in terms of needing co-defendant testimony; nevertheless, to the extent that his motion to sever is based on the need for co-defendant testimony, Terry had not made the requisite showing. Terry has not provided any information as to how he expects cross-examination of any of his co-defendants would be exculpatory, nor has he shown that any co-defendant would testify should Terry be granted a separate trial. (*See* Terry's Mot. at 5-10, dkt. 122.)

In short, none of the defendants have made the requisite showing that a particular co-defendant's testimony would be exculpatory, that that co-defendant would in fact testify should their trials be severed, and that such testimony would bear on the defendant's case. *Boykins*, 9 F.3d at 1289. Therefore, to the extent that each defendant's motion to sever is based on the need for co-defendant testimony, such motions will be denied.

55

## 2. Co-defendant Statements

Hill and Nicksion argue that their respective trials should be severed because, should the government introduce out of court statements of co-defendants, this might result in Sixth Amendment violations as in *Bruton v. United States*, 391 U.S. 123 (1968). The government states, however, that it intends to introduce evidence by defendants implicating co-defendants only in the form of live testimony at trial. (Gov't's Resp. at 18.) Hill and Nicksion's motions to sever based on potential *Bruton* violations will therefore be denied as moot.

Terry's argument regarding the need to confront witnesses, previously discussed, touches similar concerns. Terry argues that his right to confront witnesses against him will be impinged unless his trial is severed because recorded conversations between co-defendants concerning him will likely be introduced at trial. Terry maintains that if he is tried with the co-defendants who are the speakers in the recorded conversations, he will not be able to confront them, and thus will be deprived of his right to a fair trial. (Terry's Mot. at 10, dkt. 122.) However, as noted above, Terry has not made any showing that should his trial be severed, the co-defendants who are the speakers in the recorded conversations would waive their Fifth Amendment rights and testify. Terry, therefore, has not shown that severing his trial would have any effect on the confrontation issues raised. In other words, the issue Terry raises regarding his right to confront witnesses against him will be present whether or not his trial is severed.[3] Terry therefore has not demonstrated that failure

---

[3] To the extent that Terry is arguing that the out-of-court statements made by his co-defendants during recorded telephone conversations are hearsay, such argument is rejected as premature. As discussed below, out-of-court statements of co-conspirators are admissible against a defendant if the government convinces the court, as a preliminary matter and by a preponderance of the evidence, that: (1) a conspiracy existed; (2) the defendant and declarant were members thereof; and (3) the proffered statements were made during the course of and in furtherance of the conspiracy. *United States v. Santiago*, 582 F.2d 1128, 1134-35 (7th Cir.1978).

56

to sever will result in actual prejudice, and as a result his motion to sever on this ground will be denied.

### 3. Disparity of Evidence and Guilt by Association

Terry, Pigram, Lopez, Edward Cubie, Hill, and Nicksion all present arguments that their trials should be severed because there is a gross disparity of evidence against them as compared to co-defendants, and relatedly, that they will be convicted based not on the evidence but based on "guilt by association."

To be sure, there is a large amount of evidence in this matter, not all of which will necessarily be relevant to every defendant. It also may be that the evidence will establish that certain defendants occupied more prominent roles in the conspiracy or are otherwise more blameworthy than others. Nevertheless, there is a presumption that defendants properly indicted together be tried jointly, and the "danger of prejudice to the least guilty, or perhaps prejudice to all from sheer confusion of a multidefendant trial, is in all but the most unusual circumstances considered outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all." *United States v. Shorter*, 54 F.3d 1248, 1258 & n.21 (7th Cir. 1995).

In order to establish that severance is necessary to ensure a fair trial where a defendant claims that the guilt of a co-defendant will be wrongly imputed to him, the defendant "must rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow instructions from the court to consider each defendant separately. Mere speculation of 'spill over guilt' is not enough to rebut these twin presumptions." *United States v. Lopez*, 6 F.3d 1281, 1286 (7th Cir. 1993).

Moreover, while a great disparity of evidence against one defendant as compared to co-defendants may be grounds for severance, "the relevant inquiry is whether it is within the jury's

capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against him." *United States v. Moya-Gomez*, 860 F.2d 706, 765 (7th Cir. 1988).

None of the defendants have overcome the presumption that a jury will be able to follow the court's instructions in this matter and apply evidence appropriately to the individual defendants. It should be noted that, while there are several defendants in this case, and potentially a great deal of evidence, the violations charged in the indictment are relatively straightforward. Count One charges each defendant with conspiracy to distribute controlled substances, and each of the remaining six counts charges one or more of the individual defendants with either distribution of a controlled substance, possession with intent to distribute a controlled substance, or a firearms violation. The relatively straightforward nature of the charges lessens any probability that the jurors will be confused and unable to follow the court's instructions.

None of the defendants offer any particular reason why a jury will be unable to follow the court's instructions. Instead, each defendant argues that he played a comparatively minor role in the alleged conspiracy, or that the vast discovery materials relate primarily to other defendants. (Pigram's Mot. at 4, dkt. 123; Lopez's Mot. at 3-4, dkt. 137; Edward Cubie's Mot. at 4-6, dkt. 119; Hill's Mot. at 3-4, dkt. 115; Nicksion's Mot. at 24, dkt. 117; Terry's Mot. at 4, dkt 122.) Simply alleging that there is a large amount of evidence or that there is a disparity of evidence is not enough to warrant severance. To reiterate, it is insufficient that separate trials would give a defendant a better opportunity for an acquittal; a defendant must show that failure to sever would result in a deprivation of his right to a fair trial. *Souffront*, 338 F.3d at 828. None of the defendants have established that severance is necessary in order preserve their right to a fair trial.

58

In summary, none of the defendants has overcome the presumption that defendants properly indicted together be tried together. No defendant has established that severance is necessary in order for them to receive a fair trial, and each defendant's motion for severance will therefore be denied.

## D. Motions for "*Santiago*" Hearings

Defendants Mark Cubie, Terry, Lopez, Edward Cubie, Hill, and Nicksion have moved the court to conduct *Santiago* hearings and/or issue an order requiring the government to provide a written proffer concerning the admissibility of out of court statements by alleged co-conspirators. Pigram did not file such a motion, but in his motion for severance he raises the issue of the admissibility of alleged co-conspirators' statements. (Pigram's Mot. to Sever at 4, dkt. 123.) The court will therefore address Pigram's argument along with the other defendants' motions.

Statements of co-conspirators are admissible if the government convinces the court, as a preliminary matter and by a preponderance of the evidence, that: (1) a conspiracy existed; (2) that the defendant and declarant were members thereof; and, (3) that the proffered statements were made during the course of and in furtherance of the conspiracy. *United States v. Santiago*, 582 F.2d 1128, 1134-35 (7th Cir. 1978).

The Seventh Circuit has approved multiple methods by which a district court can make the necessary determination on the admissibility of co-conspirator statements. The district court may conditionally admit statements based on a pre-trial proffer by the government and subject to the court's later determination, based on evidence admitted at trial, that the government has proved by a preponderance the necessary foundational elements. *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991). The court might also hold a full-blown hearing on the matter, rule on each proffered statement individually during the course of the trial based on the evidence admitted up to that point,

59

or conditionally admit the statements, even without a pre-trial proffer, subject to the government's eventual proof of the foundational elements. *Id.*

However, in *United States v. Andrus*, 775 F.2d 825 (7th Cir. 1985), the court noted that "holding a full blown pretrial hearing for a decision which is not final is an inefficient means of resolving" the preliminary factual issues raised by the co-conspirator exception. *Id.* at 837; *see also United States v. Hunt*, 272 F.3d 488, 494 (7th Cir. 2001). Thus, the trial court may "admit the [co-conspirators'] statements subject to the government's eventual proof by a preponderance of the evidence of the elements required under Rule 801(d)(2)(E)." *Andrus*, 775 F.2d at 837.

The defendants argue for a full-blown hearing while the government argues for the conditional admittance of alleged co-conspirators' statements at trial pending the subsequent establishment of a foundation. Furthermore, at least one defendant argues that the Supreme Court's recent holding in *Crawford v. Washington*, 541 U.S. 36 (2004), presents an additional reason why a hearing should be held.[4] (Nicksion's Mot. at 21, dkt. 117) In my view, the defendants' motions concerning the admissibility of co-conspirator statements should be addressed by Judge Clevert at or before trial. It is the well-established practice in this district not to conduct a hearing on these matters in advance of trial. Judge Clevert may wish to discuss these motions and his procedures for

---

[4] Nicksion argues that co-conspirator out-of-court statements must be examined under the Supreme Court's holding in *Crawford* to determine whether such statements are "testimonial" in nature and therefore should be barred as evidence. However, Nicksion is wrong. In *United States v. Jenkins*, 419 F.3d 614 (7th Cir. 2004), the Seventh Circuit held that the tape recorded conversations of the defendant's co-conspirators were not hearsay and therefore *Crawford* was inapplicable to the question of their admissibility. "The recordings featured the statements of co-conspirators. These statements, by definition, are not hearsay. *Crawford* did not change the rules as to the admissibility of co-conspirator statements." *Id.* at 618.

60

resolving the same with counsel at a later date, such as at a final pretrial. For the foregoing reasons, no ruling on the merits of the defendants' motions for *Santiago* hearings and/or orders requiring the government to provide written proffers will be made by this court. Instead, I will defer entirely to Judge Clevert on this issue.

**E. Motions for Disclosure of Informants**

Mark Cubie, Edward Cubie, Hill, Nicksion, and Terry filed motions seeking disclosure of the identity of the confidential informants relied upon by the government. It is well established that the government has a limited privilege to withhold from disclosure the identity of a confidential informant. *Roviaro v. United States*, 353 U.S. 53, 60 (1957).

> The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

*Id.* at 59.

Therefore, when determining whether to compel disclosure of an informant's identity, courts must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. The government's limited privilege of withholding the identity of an informant gives way once the defendant proves that the information sought would significantly aid in the preparation of his defense. *United States v. Andrus*, 775 F.2d 825, 841 (7th Cir. 1985). Absent such a showing, disclosure is not required. *Id.*

Oftentimes, the government seeks to maintain the anonymity of an informant out of a concern for his or her safety. This is especially true where the defendants have been charged with a drug-related offense. As the Court of Appeals for the Seventh Circuit noted in *United States v. Bender*,

61

5 F.3d 267, 270 (7th Cir. 1993), "[u]nderstandably, not many people want to become police informants in light of the violence within the drug subculture. Drug dealers are not known for treating informers with compassion."

The Court of Appeals for the Seventh Circuit has also held that where an informer is a "mere tipster," disclosure of his identity will rarely be appropriate under the balancing test of *Roviaro*. *See United States v. Lewis*, 671 F.2d 1025, 1027 (7th Cir. 1982); *United States v. Mayomi*, 873 F.2d 1049, 1055 (7th Cir. 1989). This is so, because, although tipsters supply law enforcement officers with important leads, they are rarely further involved in the investigation, apprehension or prosecution of the suspect. However, in *Roviaro*, the Supreme Court held that where an informant is a transactional witness, that is, where he or she was an active participant in the events leading to an arrest, the government must disclose the informant's identity to the defendant. *Roviaro*, 353 U.S. at 64-65.

Nicksion requests that the government particularly disclose the identity of a confidential informant identified by the government as "CI-1." (Nicksion's Mot. at 21, dkt. 117.) The other defendants do not identify the specific informants whose identities they request disclosure of; after all, the informants are confidential. Instead, the defendants state that they believe that at least one confidential informant will be a lead prosecution witness and may have participated in the alleged wrongdoings charged in the indictment. (Mark Cubie's Mot. at 13, dkt. 130; Edward Cubie's Mot. at 14-15, dkt. 118; Hill's Mot. at 12, dkt. 111; Terry's Mot. at 15, dkt. 124.) That is, the defendants state that they have reason to believe that at least one, and possibly more, of the government's confidential witnesses are "transactional witnesses," and therefore would significantly aid in the preparation of their defense. Indeed, the government acknowledges that some of the informants used

62

in its investigation were participants in the drug trafficking activities underlying the charges in the indictment, and as such are "transactional witnesses." (Gov't's Resp. at 26, dkt. 167.)

Furthermore, the government represents that it "intends to disclose the identities of the informants whom it plans to have testify at trial." (Gov't's Resp. at 26.) However, in its response the government does not represent that it will disclose the identities of all the informants who are transactional witnesses. Rather, the government states that it will disclose the identities of only those informants whom it intends to call as witnesses at trial. This suggests that it is entirely possible that the government may choose not to call all of the informants, even though they are transactional witnesses. In my view, the government must be required to disclose the identities of all informants who are considered transactional witnesses, regardless of whether the government elects to call them as witnesses at trial.

The government proposes that it will disclose the identities of the confidential informants when it provides the defendants with its witness list, that is, three weeks before trial. (Gov't's Resp. at 26.) The defendants request that the disclosures be made at varying times before trial. Hill, Terry, and Edward Cubie request disclosure at least thirty days before trial; Mark Cubie requests disclosure at least 60 days before trial; and Nicksion maintains that thirty days before trial is not adequate but does not specify what time period he thinks would be adequate. I am satisfied that disclosure of the identities of transactional confidential informants thirty days before trial will be adequate to allow the defendants to prepare their defense.

Thus, the government will be ordered to disclose the identity of all informants who are transactional witnesses. Such disclosures are to be made no later than thirty (30) days prior to trial. Given the foregoing, the defendants' motions will be granted in part and denied in part. Moreover,

several of the defendants request not only disclosure of the informants' identities, but also a long list of related information. Such requests will be dealt with below.

## F.  Motions for Notice of Intent to Use Other Crimes Evidence

Mark Cubie, Terry, and Hill move the court for an order requiring the government to give notice of its intent to use at trial any evidence of "other crimes, wrongs, or acts." (Mark Cubie's Mot. at 1, dkt. 132; Terry's Mot. at 1, dkt. 135; Hill's Mot. at 1, dkt. 114.)  With regard to evidence concerning other crimes, wrongs, or acts, Fed. R. Evid. 404(b) requires the government to give "reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial."  The government has represented, however, that it does not intend at this time to introduce any 404(b) evidence against Mark Cubie, Terry, or Hill.  (Gov't's Resp. at 22, dkt. 167.)  The government has also stated that, should it decide to introduce 404(b) evidence, it will give the defendants notice of the "general nature" of such evidence three weeks before trial.  (Gov't's Resp. at 22.)  The defendants' motions will therefore be denied as moot.

Each of these three defendants also requests an order requiring the government to disclose "specific instances of conduct" evidence which it intends to introduce pursuant to Fed. R. Evid. 608(b), should the defendant testify.  (Mark Cubie's Mot. at 2; Terry's Mot. at 2; Hill's Mot. at 2.)  Rule 608(b) does not have a notice provision analogous to Rule 404(b), and it is the government's position that no notice is required.  (Gov't's Resp. at 22.)  This court agrees that, because there is a clear notice provision in Rule 404(b), but no analogous provision in Rule 608(b), none should be read into Rule 608(b).  *See United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995); *United States v. Stoecker*, 920 F. Supp. 876, 883 (N.D. Ill. 1996).  The defendants' motions for an order requiring notice of intent to introduce Rule 608(b) evidence will therefore be denied.

64

## G. Motions for Discovery

Hill, Mark Cubie, Terry, and Edward Cubie have filed motions requesting an order requiring the government to disclose various discovery materials. The defendants' discovery requests are made either in conjunction with their motion to disclose confidential informants (Hill's Mot. at 1-10, dkt.111; Mark Cubie's Mot. at 2-11, dkt. 130; Terry's Mot. at 2-13, dkt. 124; Edward Cubie's Mot. at 2-12, dkt. 118) or in a separate motion. (Hill's Mot. at 1-3, dkt. 112.)

The government has indicated that it intends to follow its open file policy in this case. Criminal Local Rule 16.1(b) provides, in pertinent part, that

> "open file policy" means disclosure without defense motion of all information and materials listed in Fed. R. Crim. P 16(a)(1)(A), (B), and (D); upon defense request, material listed in Fed. R. Crim. P. 16(a)(1)(C); material disclosable under 18 U.S.C. § 3500 other than grand jury transcripts; reports of interviews with witnesses the government intends to call in its case-in-chief relating to the subject matter of the testimony of the witness; relevant substantive investigative reports; and all exculpatory material.

In turn, Crim. L.R. 16.1(a) provides, in pertinent part, that

> [i]f the government is following the open file policy, the government need not respond to and the Court must not hear any motion for discovery under Fed. R. Crim. P. 16(a) or (b) unless the moving party provides in the motion a written statement affirming (i) that a conference with opposing counsel was conducted in person or by telephone, (ii) the date of such conference, (iii) the names of the government counsel and defense counsel or defendant between whom such conference was held, (iv) that agreement could not be reached concerning the discovery or disclosure that is the subject of the motion, and (v) the nature of the dispute.

None of the defendants provided a written statement in accordance with the requirements of Crim. L.R. 16.1(a), and therefore, each failed to comply with the Local Rules. Furthermore, the government has stated that, pursuant to its open file policy, it

> has turned over, and will continue to turn over, any and all exculpatory or impeachment evidence as defined by *Brady* [373 U.S. 73 (1963)] and its progeny.

65

No later than three weeks prior to trial, the government will disclose to the defendants the prior criminal convictions of its witnesses, as well as statements of all promises, rewards, inducements or consideration for any testifying witness. At that time, it will also disclose other impeachment material pursuant to *Giglio* [405 U.S. 150 (1972)], including plea agreements, proffer letters, and grants of immunity.

In sum, the government acknowledges its obligations under Brady and its progeny, and will continue to disclose all exculpatory and impeachment material.

(Gov't's Resp. at 28, dkt. 167.) The government has represented that it has and will continue to turn over all required evidentiary materials, and none of the defendants have particularly asserted that the government has failed to do so. As a result, the defendants' motions will be denied as moot.

**F. Motion to Strike Surplusage**

Mark Cubie has filed a motion asking the court to strike surplusage from the indictment. Specifically, Mark Cubie asks the court to strike paragraphs 3-9 of Count One, paragraph 2 of Count Four, and paragraph 2 of Count Five. (Mark Cubie's Mot., dkt. 129)

Federal Rule of Criminal Procedure 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment . . . ." The Advisory Committee Notes to subdivision (d) explains that the "rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." In other words, "legally relevant information is not surplusage." *United States v. Bucey*, 691 F. Supp. 1077, 1081 (N.D. Ill. 1988). Moreover, motions to strike should be granted "only if the targeted allegations are *clearly not* relevant to the charge *and* are inflammatory and prejudicial." *United States v. Andrews*, 749 F. Supp. 1517, 1518 (N. D. Ill. 1990) (emphasis in original).

Paragraphs 3-9 of Count One of the superseding indictment state as follows:

66

3.  The primary purpose of the conspiracy was to accumulate money, wealth, real property and other assets, through the transportation, distribution, and sales of powder and crack cocaine.

4.  It was part of the conspiracy that Mark A. Cubie purchased multi-kilogram quantities of cocaine from Chicago area resident Jose Lopez. Lopez often "fronted" (provided on consignment) the cocaine to Cubie.

5.  It was also part of the conspiracy that once Cubie obtained cocaine from Lopez, Cubie distributed the cocaine to several primary distributors in and around Milwaukee. Cubie often "fronted" the cocaine to the primary distributors. The primary drug distributors for the conspiracy included, but were not limited to, Orlandes Nicksion, Ronald Q. Terry, Delano Hill, and Edward Cubie. The primary distributors distributed the cocaine in smaller amounts to regular customers. The primary distributors often "fronted" the cocaine to the regular customers.

6.  It was further part of the conspiracy that the coconspirators used various residences, businesses, storage lockers, and trap vehicles to transport, store, package, and sell the cocaine and crack cocaine.

7.  It was further part of the conspiracy that the coconspirators used cellular to communicate with each other while conducting their drug trafficking activities.

8.  It was further part of the conspiracy that some members of the conspiracy used and carried firearms during and in relation to their drug trafficking activities.

9.  It was further part of the conspiracy that some members of the conspiracy used threats of violence in relation to their drug trafficking activities.

All in violation of Title 21, United States Code, Section 846.

Mark Cubie argues that the allegations contained in paragraphs 3-9 of Count One are immaterial, irrelevant, and unduly prejudicial. (Mark Cubie's Reply at 2, dkt. 174.) In my opinion, the allegations of paragraphs 3-9 are not irrelevant to the conspiracy charge. To be sure, the indictment would not have been deficient if it did not contain all of the specifics alleged in paragraphs 3-9, but that does not render the specifics irrelevant. There is no requirement that an indictment be bare-bones. It is clear that in order to prove a conspiracy, the government will have

67

to prove some instances of conduct, and paragraphs 3-9 simply contain the instances of conduct which the government intends to prove. As such, they are not irrelevant. Moreover, paragraph 3 alleges a motive for the alleged conspiracy. Again, while setting forth a motive might not be essential to an indictment for conspiracy, it is not irrelevant.

Counts Four and Five of the superseding indictment charge Mark Cubie with firearm violations. The portion of those counts which Mark Cubie seeks to have stricken state with specificity the firearm involved. Each count states that the firearm involved was "a loaded black Beretta .22 caliber semi-automatic firearm, bearing serial #C69868." In my opinion, when a defendant is charged with the illegal possession or use of a firearm, the identity of the specific firearm in question is not irrelevant to the charge.

As stated above, portions of the indictment should be stricken only if they are clearly not relevant to the charge and are inflammatory. In sum, because the portions of the indictment which Mark Cubie seeks to have stricken are not irrelevant to the charges, his motion to strike surplusage will be denied.

### III. RECOMMENDATIONS AND ORDERS

**NOW THEREFORE IT IS RECOMMENDED** that Mark Cubie's (dkt. 134), Nicksion's (dkt. 117), Terry's (dkt. 128), Hill's (dkt. 116), Edward Cubie's (dkt. 121), Pigram's (dkt. 127), and Lopez's (dkt. 136) motions to suppress evidence obtained through Title III intercepts be **DENIED**;

**IT IS FURTHER RECOMMENDED** that Mark Cubie's Motion to suppress evidence recovered during the execution of the search warrant at his residence (dkt. 131) be **DENIED;**

**IT IS FURTHER RECOMMENDED** that Mark Cubie's motion to suppress evidence seized during a traffic stop on February 2, 2005 (dkt. 126) be **DENIED**;

68

IT IS FURTHER RECOMMENDED that Nicksion's motion to suppress fruits of the search at 8666 S. Chicago Avenue, Oak Creek, Wisconsin (dkt. 117) be DENIED;

IT IS FURTHER RECOMMENDED that Nicksion's motion to suppress all information garnered from the "data loader" installed on his vehicle on April 26th, 2005 (dkt. 117) be DENIED;

IT IS HEREBY ORDERED that Hill's (dkt. 115) and Nicksion's (dkt. 117) motions to have their respective trials severed from the trials of their co-defendants be and hereby are DENIED IN PART ON THE MERITS and DENIED IN PART AS MOOT;

IT IS FURTHER ORDERED that Pigram's (dkt. 123), Edward Cubie's (dkt. 119), Terry's (dkt. 122), and Lopez's (dkt. 137) motions to have their respective trials severed from the trials of their co-defendants be and hereby are DENIED;

IT IS FURTHER ORDERED that Mark Cubie's (dkt. 133), Terry's (dkt. 125), Lopez's (dkt. 138), Edward Cubie's (dkt. 120), Hill's (dkt. 113), and Nicksion's (dkt. 117) motions for *Santiago* hearings and/or orders requiring the government to provide written proffers concerning the admissibility of out of court statements by alleged co-conspirators, as well as Pigram's related arguments, be and hereby are deferred entirely to Judge Clevert for resolution;

IT IS FURTHER ORDERED that Mark Cubie's (dkt. 130), Edward Cubie's (dkt. 118), Hill's (dkt. 111), Nicksion's (dkt. 117), and Terry's (dkt. 124) motions seeking disclosure of the identity of the confidential informants be and hereby is GRANTED IN PART and DENIED IN PART. The government is ordered to disclose the identity of all informants who are transactional witnesses no later than thirty (30) days prior to trial;

IT IS FURTHER ORDERED that Mark Cubie's (dkt. 132), Terry's (dkt. 135), and Hill's (dkt. 114) motions for court orders requiring the government to give notice of its intent to use at trial

69

evidence governed by Fed. R. Evid. 404(b) and 608(b) be and hereby are **DENIED IN PART AS MOOT** and **DENIED IN PART ON THE MERITS**;

**IT IS FURTHER ORDERED** that Mark Cubie's (dkt. 130), Hill's (dkt. 111 and 112), Terry's (dkt. 124), and Edward Cubie's (dkt. 118) motions for court orders requiring the government to disclose discovery materials be and hereby are **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that Mark Cubie's motion to strike surplusage (dkt. 129) be and hereby is **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) - (C), Federal Rule of Criminal Procedure 59(a) - (b), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any order or recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation and order.  Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures.  Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case.  Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 7th day of February, 2006, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

70