# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       Plaintiff,

      v.                              Case No. 05-CR-146

MARK A. CUBIE,
ORLANDES NICKSION,
RONALD Q. TERRY,
ANTHONY L. BURKE,
DELANO HILL,
EDWARD CUBIE,
SYLVESTER PIGRAM,
JOSE LOPEZ, and
DONALD BUCHANAN,

       Defendants.

**RECOMMENDATION AND ORDER RE: PRETRIAL MOTIONS FILED BY CERTAIN DEFENDANTS AFTER THE RETURN OF A SECOND SUPERSEDING INDICTMENT**

## I. BACKGROUND

On June 7, 2005, a grand jury sitting in the Eastern District of Wisconsin returned a seven-count indictment, together with a forfeiture provision, in which Mark Cubie ("Mark Cubie" or "Mark" or "Cubie"), Orlandes Nicksion ("Nicksion"), Ronald Q. Terry ("Terry"), Anthony L. Burke ("Burke"), Delano Hill ("Hill"), Edward Cubie ("Edward Cubie" or "Edward"), and Sylvester Pigram ("Pigram"), were named as defendants.

On July 19, 2005, a superseding indictment was returned by the grand jury. The criminal charges set forth in the superseding indictment were the same as were set forth in the original

1

indictment. However, an additional person, Jose Lopez ("Lopez"), was added as a defendant in Count One, the drug conspiracy charge.

On August 22, 2006, a second superseding indictment was returned by the grand jury. An additional person, Donald Buchanan ("Buchanan"), was added as a defendant in the second superseding indictment.

All of the defendants were arraigned on the various indictments in which they were named. All defendants entered not guilty pleas to the charges, although some defendants have since entered pleas of guilty to at least some of the charges.

Previously, many of the defendants filed pretrial motions. These motions were addressed by this court in a Recommendation and Order issued on February 7, 2006. On May 31, 2006, the Honorable Charles N. Clevert, Jr., United States District Judge adopted this court's Recommendation and Order.

As previously noted, subsequent to Judge Clevert's order of May 31, 2006, the grand jury returned a second superseding indictment. Several of the defendants, to wit, Cubie, Terry, Nicksion and Buchanan, filed pretrial motions after the return of the second superseding indictment.

Specifically, Terry filed a Second Motion to Suppress Title III Intercepts, and both Cubie and Nicksion filed motions to adopt Terry's motion to suppress.[1] Terry also filed a number of motions in limine "prohibiting or restricting the use of certain evidence," including evidence of the Earl Benion homicide, evidence of certain other homicides, certain gang related evidence, and certain

---

[1]On December 29, 2006, Hill also filed a motion to adopt Terry's Second Motion to Suppress Title III Intercepts.

2

non-specified other acts evidence.[2]

Buchanan filed a motion to suppress evidence. Buchanan also filed a "Request for Pre-trial Notice of Government's Intent to Use Evidence of Other Crimes or Bad Acts"and a "Demand for Specific <u>Kyles</u> and <u>Brady</u> Information." Finally, Buchanan filed a "Motion in Limine to Introduce Statement of Codefendant Mark Cubie under Fed. R. Evid. 804(b)(3)."

## II.  TERRY'S SECOND MOTION TO SUPPRESS TITLE III INTERCEPTS

On December 6, 2006, an evidentiary hearing was conducted on Terry's motion to suppress. After this hearing, on December 6, 2006, the government filed a motion to re-open, requesting that the court accept the attached affidavit of Detective Daniel Thompson and exhibits. The defendants then requested a continuation of the evidentiary hearing from December 6, 2006 in order to cross-examine Detective Thompson. This second hearing was held on December 20, 2006.

Thereafter, the parties filed briefs in support of their respective positions on the issues raised by Terry. Consequently, the defendant's motion to suppress is now fully briefed and is ready for resolution. For the reasons which follow, it will be recommended that Terry's motion to suppress be denied.

### A.  FACTUAL BACKGROUND

**The Evidentiary Hearing**

As previously stated, evidentiary hearings were conducted on December 6, 2006, and on December 20, 2006. Detective Daniel Thompson was the only witness at both hearings. The following is a summary of the testimony.

---

[2] Terry's "motions in limine" also include a request for expert testimony, a request for reports of examinations and tests, and a motion for sequestration of all witnesses.

Case 2:05-cr-00146-PP   Filed 01/03/07   Page 3 of 22   Document 341

Detective Daniel Thompson ("Thompson") testified that he is a detective with the City of Milwaukee Police Department currently assigned to the HIDTA drug task force. He has been a law enforcement officer for sixteen years. As part of his assignment with HIDTA, he conducts long term drug investigations on organized drug and gang groups. He has been doing this particular work for at least five years. (Tr. at 3-4.)

Thompson testified that he is familiar with pen registers and trap and trace devices. He stated that he is familiar with the court process needed to obtain pen registers and trap and trace devices. Specifically, he explained that in order to obtain information from a pen register or trap and trace, he needs to obtain a court order to send to the phone company. He has obtained these court orders many times, including many times as part of the case involving Cubie and Terry. (Tr. at 4.)

Thompson began work on this particular case in January 2005. As part of his work on the case he was focused on the cellular phones of Cubie, Nicksion, and Terry in the early spring of 2005. By March 2005, Thompson had obtained court orders for a pen register and trap and trace device on a cellular telephone he believed to be used by Cubie. That telephone number was 414-460-1716 ("x1716"). He had an active pen register on that phone during the month of March 2005. (Tr. at 5.)

Thompson testified that his goal in his investigation of Cubie and in particular his telephone was to get a better understanding of Cubie's organization. The best means was to attempt to obtain a Title III wiretap. (Tr. at 6.)

Thompson testified as to how he learned that Cubie was no longer using x1716. On April 1 or 2, 2005, Thompson learned that x1716 stopped making and receiving calls to Nicksion and Terry. (Tr. at 6) At the December 20 hearing, Thompson testified that, in general, on April 2 calls to the numbers associated with individuals with whom Cubie would normally have conversations

4

dramatically stopped for x1716. These individuals included Nicksion, Jose Lopez, Anthony Burke, and Delano Hill. Instead, starting on April 2 there was a whole new list of numbers calling to and being called from x1716 that Thompson had never seen before. (Dec. 20 Tr. at 10; Ex. 6.) Based on this information, Thompson believed that the phone had changed hands. (Tr. at 7.)

On April 4, Thompson used a confidential informant to call x1716. It was a monitored call. A female answered the phone and told the informant that Cubie no longer had the x1716 phone. She would not give Cubie's new phone number to the informant. (Tr. at 7-8.)

Thompson then testified that when looking at the pen register of Nicksion[3] after March 29, he noted that Nicksion started to call and receive calls from (414) 460-5638 ("x5638"). The frequency of the calls was consistent with the frequency of calls with x1716 prior to March 29. (Tr. at 10; Ex. 9.) Thompson noted that Nicksion's pen was the key to identifying x5638 as Cubie's new phone. (Dec. 20 Tr. at 22.)

Thompson later checked the pen register for x1716. The pen register showed that there was a phone call from x1716 to x5638.[4] (Tr. at 8.) This call occurred on March 31, 2005. (Dec. 20 Tr.

---

[3]Thompson mistakenly testified that he used the pen register of Ronald Terry to help determine that x5638 was Cubie's new number. Thompson subsequently corrected this testimony with an affidavit and with testimony at the hearing of December 20. (Dec. 20 Tr. at 8.) Thompson admitted that there was not any pen and trap information or toll information on Terry's phone as of the early April date when Thompson determined that Cubie's new cellular telephone was x5638. (Dec. 20 Tr. at 7-8.) There were subpoenas issued for Terry's phones, but agents did not obtain any information on Terry's phones until after April 7. (Dec. 20 Tr. at 7.) Thompson reviewed Terry's pen and trap information relative to x5638, but this was done in early May in order to assist another agent in an attempt to obtain a Title III affidavit for Terry's phones. (Dec. 20 Tr. at 11.)

[4]Thompson mistakenly testified at the December 6 hearing regarding the timing of this call. At the December 6 hearing, Thompson stated that the woman with the x1716 phone called x5638 a couple of hours after the confidential informant called x1716. (Tr. at 30.) At the December 20 hearing, Thompson corrected this statement and testified that the phone call from

5

at 25.)  At the December 20 hearing, Thompson clarified that he learned of the call between x1716 and x5638 after the informant called x1716.  (Dec. 20 Tr. at 29.)

On April 12, 2005, Thompson obtained a pen register order, a trap and trace order, and a § 2703(d) order for x5638.  (Tr. at 10; Ex. 2-4.)  The third page of Exhibit 4 was identified by Thompson as Attachment A to the § 2703(d) order.  Attachment A provides for telephone toll information, numbers dialed and incoming numbers, and call durations for the period March 1, 2005 until April 12, 2005, which was the date the order was signed.  (Tr. at 12.)

Thompson immediately faxed the orders on April 12 to Teliwire, which is the phone company that Cubie used to obtain his prepaid telephone.  Thompson had been in contact with Teliwire about these court orders prior to obtaining the orders, but had not received any information from Teliwire prior to faxing Teliwire the court orders. (Tr. at 14.)  Either later that evening or early the next morning, Teliwire sent Thompson the historical toll information on x5638 that the § 2703(d) covered, as well as the live pen and trap and trace information on x5638.  (Tr. at 15.)  Thompson testified that Teliwire would not provide this type of call information without a court order.  (Tr. at 14.)

Thompson prepared a report using the HIDTA computer system regarding his identification of x5638 as Cubie's new telephone number.  (Tr. at 15.)  Thompson identified the report as Exhibit 1.  HIDTA automatically generates an origination date and time for when the report is started.  There is also a space where the date and time are manually entered by the user.  On Thompson's report, he manually entered April 11th, 2005 at 4:00 pm, which appears approximately five lines down on the first page of the report.  (Tr. at 17.)  The computer stamp date of April 12, 2005 at 3:18 pm appears

_____

x1716 to x5638 took place prior to the confidential informant calling x1716.  (Dec. 20 Tr. at 25.)

6

on the second page of the report. (Tr. at 18.) Thompson testified that there is no way that the report could have originated on April 11, as the computer date automatically generates the time. As a result, Thompson stated that the April 11 date was a typo. (Tr. at 19.)

The first several paragraphs of the report contain a discussion of the call that the confidential informant made to x1716 on April 4. The report then contains an analysis of the toll information that Thompson obtained in order to identify Cubie's new x5638 phone. (Tr. at 19; Ex. 1.) Thompson submitted this report to AUSA Sanders on April 13, 2005. (Tr. at 13.)

Thompson identified Exhibit 5 as the wiretap affidavit eventually presented to Judge Randa on April 25 in order to obtain authorization for a Title III wiretap on Cubie's new phone, x5638. On page 32, there is a chart of call count information, which details how many times Cubie's old phone, x1716, called other relevant phone numbers, and then how many times Cubie's new phone, x5638, called the same relevant phone numbers. The information relative to x5638 occurs during the date range of April 7 to April 20, 2005. (Tr. at 20.)

Thompson testified that he had a court-ordered pen register and trap and trace for x5638 for the period April 12 to April 20, 2005. He also had a § 2703(d) order that provided toll information for x5638 for the period April 7 to April 12. Consequently, all of the toll or call count information in the wiretap affidavit were covered by a valid court order. (Tr. at 20-21.)

Thompson also testified that all of the information on page two of the § 2703(d) application, which lays out the factual basis that AUSA Dan Sanders presented to the court to obtain the § 2703(d) order, was information obtained from the x1716 pen register and trap and trace orders. (Tr. at 21.)

On cross examination, Thompson testified that it is physically impossible for officers to

7

monitor incoming and outgoing call data of a phone when an order has not been faxed to the telephone provider. (Tr. at 22.)

Thompson also testified that there was no reference to Ronald Terry in the report marked Exhibit 1, or in the Title III application marked Exhibit 5. (Tr. at 23.) Thompson explained Terry's absence in the Title III application as being due to another investigation of Terry in which agents were preparing to obtain a Title III affidavit for Terry's phone. (Tr. at 24.)

Thompson stated that the analysis referred to on page four of the § 2703(d) application refers to x1716, and describes how x5638 began to call the most common and frequently called numbers associated with x1716. Specifically, Thompson testified that the most common and frequently called numbers were Nicksion, Terry, and x1716.[5] (Tr. at 29.)

Thompson testified that the record generation date is within minutes of the § 2703(d) order being time stamped on April 12. The court took judicial notice that the time stamp does not necessarily reflect when the order was actually signed, but rather indicates when it was time stamped at the Clerk's Office. (Tr. at 32-33.)

Thompson was rushing to get the information in his report to AUSA Sanders because the agents were prepared to go up on a Title III affidavit on x1716, and needed to then justify the Title III for the 5638 number. (Tr. at 32-33.) He started writing the information regarding x1716 and was leaving the rest of the call record information open until he obtained it from Teliwire. (Tr. at 32.).

## B. DISCUSSION

Title III mandates exclusion of all direct or derivative evidence obtained as the result of an

---

[5]As noted above, Thompson later corrected his testimony that he relied on Terry's phone to determine that x5638 was Cubie's new number.

unlawfully intercepted communication. 18 U.S.C. § 2515, 2518(10)(a)(i). The purpose of suppression under Title III is "not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also 'to protect the integrity of court and administrative proceedings.'" *Gelbard v. United States*, 408 U.S. 41, 51 (1972).

The defendants assert two grounds for suppression of the communications intercepted by the government pursuant to a Title III wiretap of the 5638 number: (1) the government used illegally intercepted call data to obtain the April 12, 2005 pen register, trap and trace, and § 2703(d) orders, which were subsequently used to obtain the April 26, 2005 Title III intercept order; and (2) government agents knowingly failed to disclose the illegality of the pre-April 12, 2005 intercepts in the April 26, 2005 Title III application. The defendants argue that suppression is appropriate under 18 U.S.C. § 2515, 2518(10)(a)(i). They also assert that suppression is justified under *Franks v. Delaware*, 438 U.S. 154 (1978), since absent the disclosure of the purported illegally obtained evidence, there is insufficient information on which any court could find probable cause that x5638 was Cubie's new number.

The defendants concede it to be undisputed that the government had reason to believe that Cubie was no longer using his previous x1716 number. Consequently, the question before the court is whether the government employed unlawful means to determine that x5638 was Cubie's new phone number.

The defendants' argument is unavailing. Simply stated, the facts of the case do not support the defendants' contention that the government used illegally intercepted call data to obtain the orders from April 12. The government has provided sufficient evidence to support its contention that

9

all the call data used to obtain the orders from April 12 were intercepted legally.

The government has provided an account of the investigation which provides details as to how all the information was lawfully obtained, and which is corroborated by outside evidence. According to Thompson, he discovered that x1716 was no longer Cubie's number by looking at legally obtained call records, and the abrupt stop in calls is corroborated by the call records shown in Exhibit 6. In order to determine Cubie's new number, Thompson then used legally obtained call records for Nicksion's phone, as well as a call from x1716 to x5638 to ascertain that Cubie's new phone was x5638. The pattern of calls from Nicksion described by Thompson is corroborated by the lawfully obtained phone records for Nicksion's phone shown in Exhibit 9. Exhibit 6, while showing a discrepancy in the timing of the call between x1716 to x5638, corroborates the existence of a call between the two numbers. Thompson next testified that he used this information to obtain the pen, trap, and § 2703(d) orders for x5638. The application and orders are documented in Exhibits 2-4. These orders were signed on April 12, and faxed to Teliwire, which then sent call record information for x5638, as shown in Exhibit 6. Thompson used this call record information to write his report. Thompson testified that he began his report on April 12, and incorrectly manually inserted April 11 as the date of the report. This is corroborated by the computer stamped origination date displayed in Exhibit 1. Thompson then stated that he sent the report to AUSA Sanders the next day, April 13, which is corroborated by the date on Exhibit 1 indicating that changes were made to the report on April 13.

The defendants, however, contend that given the facts of this case, the most reasonable inference is that Thompson performed his analysis for Exhibit 1 prior to obtaining pen register, trap and trace, and § 2703(d) orders on April 12 for x5638, and that he provided this information as

10

support for the government's § 2703(d) application. Moreover, the defendants argue that Exhibit 1 bears the computer stamped origination date of April 12 because Thompson attempted to document his conclusions in his report on April 12 only after he had reached them. The manually inputted date of April 11 therefore reflects when this analysis was actually performed. (Def.'s Br. at 9.)

The defendants' contend that Exhibit 1 documents the government's illegal interception of call data information. Specifically, they argue that Thompson's report shows that law enforcement officials were in possession of call data information from x5638 prior to the April 12, 2005 authorization. They point to the detailed comparisons of the calling patterns for x1716 and x5638, as described in Thompson's report.

> Orlandes Nicksion, using cell number 406-0804 had conversations with the 1716 number 136 times from March 10th through March 31st 2005. From March 31 to April 9th 2005 Orlandes stopped calling/receiving 1716 and has been calling 414-460-5638 22 times. . . .
>
> Delano Hill, using cell phone number 414-788-2980 had conversations with the 1716 number 111 times from 3-10 to 3-30-2005. Hill stopped calling/receiving the 1716 number and on April 7th 2005, he called/received 414-460-5638 eight times. . . .
>
> Machelle Jelks, using phone number 327-7882 from 2-06 to 2-7-2005 calls/receives calls from 213-5072 (Cubie's first known cell phone) 3 times, she then calls/receives calls from 414- 460-1716 31 times from 3-16 to 3-28-2005, and from 4-8 to 4-10 she calls/receives calls from 414-460-5638 six times. Jelks is currently on a lease with Cubie at 4400 W Arthur Crt. and has been seen on surveillance with Cubie.
>
> Denise Coleman (Subscriber) using phone 414-336-5975 calls/receives calls from 460- 1716 138 times from 3-10 to March 31, 2005. Coleman stops calling/receiving the 1716 number and calls 460-5638 81 times from 4-07 to 4-11-2005. Two other phones subscribed to Denise Coleman have phone conversations with 414-213-5072 13 times from 02-06 to 02-07-2005. Denise Coleman calls the 460-1716 number 103 times from 03-10 to 03-30-2005, and the 460-5638 number 39 times from 04-07 to 04-11-2005.
>
> Charles Bell (Subscriber), using cell phone 202-7413 calls/receives Nicksion's cell phone of 406-0804 3 times from 03-24 to 03-28-2005, he calls/receives 460-1716

119 times from 03-11 to 04-02. On 4-2 no calls were from the 1716 number to the 202-7413 number. This number also had 16 incoming and outgoing calls to the 460-5638 from 04-06 to 04-08-2005.

Jose Lopez (Chicago subscriber) using phone number of 773-416-2111 calls/receives 115 calls from the 460-1716 number from 03-14 to 04-02-2005. On 040-02 there was [sic] no outgoing calls from 460-1716 to the 773 number listed above. This 773 number then called/received calls from the 460-5638 number 9 times from 04-07 to 04-09-2005.

Peter Santoya using cell phone 920-254-7113, from 03-12 to 03-20-2005 calls/receives 25 calls to the 460-1716 number. From 04-7 to 04-9-2005 there is [sic] 24 calls between Santoya's phone and the 460-5638 number. . . .

Gerald Westphal (Subscriber) using 414-534-61546 from 2-06 to 02-09-2005 has five calls between said number and 414-213-5072. From 03-10 to 03-28 there are 70 calls between 534-6156 and 460-1716. From 04-07 to 04-10-2005 there are 18 calls between the 534-6156 and 460-5638.

Katina Hamilton using cell number 414-649-9679, from 02-06 to 02-06 had three calls between said number and 414-213-5072. From 03-10 to 03-28-2005 there are 80 calls between 649-9679 and 460-1716. From 04/07 to 04/09-2005 there are 6 calls between 649-9679 and 460-5638. . . .

There many more examples of common callers to the 460-1716 which stopped making calls to that number on the 2nd of April and started to makes calls on the 460-5638 number that could be recovered from the pen. It should be noted that all three phones, which belong to Cubie are all resale pre-paid phones from Teliwire with no subscriber information listed.

(Ex. 1.)

The defendants note that because there were no court orders authorizing access to the phones used by Jelks, Coleman, Lopez, Santoya, Hamilton, and Westphal, the April 4-11, 2005 call information involving x5638 could only have been acquired by accessing call data information through a pen register or trap and trace device for x5638. (Def.'s Br. at 8.)

The defendants then point to the manually entered date on Thompson's report, which is "April 11, 2005." (Ex. 1.) They argue that because Thompson's testimony on various material

12

points have been discredited and changed, his credibility has been wholly undermined, and his testimony that this April 11 date was simply a typo is thus unreliable. The defendants also discuss additional facts to support the inference that Thompson must have performed his analysis prior to April 12. They contend that the analysis would have taken hours to perform, that the wording in Exhibit 1 is written in such a manner as to justify interception of x5638, and that the report makes no mention of call data from April 12. (Def.'s Br. at 9.)

Despite these possible inferences, the government has presented sufficient evidence to establish that it legally obtained all of its call data information for x5638. As an initial matter, I am satisfied that Thompson generated his report on April 12, 2005 at 3:18 pm. The origination date and time is automatically stamped by the computer system when the report is generated.

Moreover, on its own, the April 11 date does not implicitly indicate that the analysis was actually done on April 11. Thompson testified that this was a typo, and his testimony regarding the computer origination date establishes that he could not have actually generated the report on April 11. Although the computer system allows for back-dating of reports to indicate that the events in the report occurred on an earlier date than the origination date, the date itself is not definitive proof that this was when Thompson performed his analysis. Thompson could not have entered this date into the system prior to April 12, and it is pure speculation to try to decipher what was in Thompson's mind when he manually typed in April 11.

Moreover, the length of time to perform the analysis does not create an inference that the analysis was done before April 12. Thompson testified that he started the report at 3:18 pm on April 12 in order to get a head start before the call data information arrived. He received the call data later that night on April 12, and finished his report and faxed it to AUSA Sanders on April 13. Although

13

the report may have taken hours to complete, this does not create an inconsistency with Thompson's testimony, or the date stamps on the report. The date stamp on Exhibit 1 indicates that the last change to the report was made on April 13, 2005 at 11:24 am, well after he received call data from Teliwire. (Ex. 1.)

It is unclear exactly what the defendants are arguing when stating that Exhibit 1 is "written in such a manner as to justify interception of x5638." (Def.'s Br. at 9.) The report was to be used to justify a Title III wiretap for x5638, and is worded in a manner consistent with this purpose. An inference that the wording somehow indicates an attempt to justify an illegal interception of x5638 call data is purely speculative. Moreover, the lack of call data from April 12 does not necessarily indicate an earlier analysis date. Thompson received call data up through April 12 prior to his completing and sending out the report. Any explanation as to why he chose not to include this available information in his final report is purely speculative.

Moreover, even with an inference that Thompson must have performed his analysis prior to receiving court authorization to intercept call data, the defendants do not indicate how Thompson could have obtained call data information from x5638. According to Thompson's testimony, it is not possible for agents to receive call data information prior to sending a court order to Teliwire. Again, it is purely speculative, and unsupported by the evidence, to envision a way in which Thompson could have obtained call data information from x5638 without first sending a court order to Teliwire.

To be sure, Thompson has given conflicting testimony regarding important points of the government's case. He incorrectly stated that he used a pen register on Ronald Terry's phones to help determine that x5638 was Cubie's new number. In addition, he incorrectly testified that the

14

woman with the x1716 phone called x5638 a couple of hours after the confidential informant called x1716.

Although these misstatements may bring into question Thompson's ability to remember exactly how he went about identifying x5638 as Cubie's new number, they do not indicate illegality in obtaining call records. Thompson's analysis is detailed in his report sent to AUSA Sanders, and his revised testimony does not contradict anything in this report. There is no mention of Terry's phone records in the report, and no data was obtained from Terry's phones until early May 2005 when the government obtained pen and trap orders. (Dec. 20 Tr. at 5-8; Ex. 1, 10-13.) As there were no pen registers regarding Terry's phone to review at the time of the report, the most reasonable explanation is that Thompson was simply mistaken when testifying that he used Terry's pen and trap data.

With regards to his testimony regarding the timing of the x1716 to x5638 call, this also does not taint his analysis. There is no indication that he relied on the exact timing of the call when generating his report or when seeking his pen, trap, and § 2703(d) orders for x5638. Moreover, this call was simply supplemental information which aided Thompson in identifying x5638 as Cubie's new number. Thompson discovered the existence of the call between x1716 and x5638 after the confidential informant called x1716, and used this call to help link the two numbers together. It did not form the primary basis for his conclusion that x5638 was Cubie's new number.

The defendants also point to the government's § 2703(d) application from April 12, 2005, which references an analysis of "the most frequently called numbers" to x1716 in its explanation as to how the government concluded x5638 was Cubie's new phone number:

b. An analysis of the telephone records pertaining to the most commonly and

15

frequently called numbers to (414) 460-1716 over a two month period indicates that at the time the informant left the above-described message, (414) 460-5638 began to call the *most common and frequently called numbers associated with (414) 460-1716.* Telephone records indicate that (414)460-5638 is a pre-paid number through a Sprint re-seller with no subscriber name listed, just as (414)460-1716 was during its use and operation by Cubie during the past several months.

(Ex. 4, April 12, 2005 § 2703(d) Application at 2) (emphasis added).

The defendants argue that the reference to multiple numbers in the application indicates an apparent reliance by the government on Thompson's analysis of intercepted x5638 call data. As this application was done prior to a court order allowing for an interception of x5638 call records, the defendants contend that Thompson must have passed on illegally obtained information from x5638 to the U.S. Attorney's office for use in the § 2703(d) application. (Def.'s Br. at 7-8.)

The defendants also emphasize the use of the word "numbers" to suggest a conflict between Thompson's testimony and the application. Namely, the defendants contend that Thompson's testimony reflects that he identified x5638 using only one number, Nicksion's, and that the word "numbers" in the § 2703(d) application indicate that either the government employed a material misrepresentation to obtain the April 12 § 2703(d) order, or that Thompson's testimony should be discounted. (Def.'s Br. at 10.)

To begin with, the inference that Thompson passed along illegally intercepted call data from x5638 relies solely on speculation. As discussed above, there is no explanation as to how Thompson could have obtained call data from x5638 prior to a court order being sent to Teliwire. Outside of the use of the word "numbers," there is no other evidence to support a finding of illegal interception.

However, the defendants are correct in pointing out the discrepancy between the § 2703(d) application and Thompson's testimony. From Thompson's testimony, it appears that he relied

16

primarily on an analysis of Nicksion's number, corroborated by the existence of the call between x1716 and x5638. As such, the use of "frequently called numbers" in the application is not completely accurate.

However, Thompson's testimony that he concluded that x5638 was Cubie's new number based on his analysis of Nicksion's number should not be discounted. There is ample evidence to support that this was the primary basis leading to the identification of Cubie's number. It is undisputed that there was a legally obtained pen register for Nicksion's phone available to Thompson at the time of the § 2703(d) application. Moreover, Thompson has consistently testified that Nicksion's phone records were a major basis of the investigation. As seen in Exhibit 1, Nicksion's phone record is listed first, and the report details substantial calling between Nicksion's phone to both x1716 and x5638. The defendants do not dispute that this call information was obtained legally.

Even discounting the call between x1716 and x5638, leaving only the review of Nicksion's pen and trap data as the sole basis for the § 2703(d) application, there was sufficient evidence to meet the "reasonable grounds" test for the issuance of a § 2703(d) order. The issuance of a § 2703(d) order is proper "if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation."

In the case at hand, a review of Nicksion's pen and trap data would provide specific and articulable facts showing that the records of x5638 would be relevant and material to an ongoing criminal investigation. Thompson's testimony established that x1716 was no longer being used by

17

Cubie as of March 31, as partly evidenced by the disappearance of x1716 from the call records of Nicksion's phone, and his testimony is corroborated by call records legally obtained through a pen and trap on x1716 and Nicksion's phone. Further, Thompson's testimony established that Nicksion's phone began calling x5638 starting on March 31, the same time that x1716 abruptly stopped calling its frequently called numbers.

The defendants argue that this information is insufficient to meet the reasonable grounds test required for issuance of a § 2703(d) order, much less the probable cause standard for justifying a Title III intercept. (Def.'s Br. at 16.) I disagree. As discussed above, there was ample evidence to show that there were reasonable grounds to believe that information from x5638 would be relevant and material to the investigation. Moreover, the standard of proof justifying a Title III intercept is immaterial. The government had probable cause for the Title III intercept based on a number of matters, including not only Nicksion's call data, but also on the list of call data in Thompson's report which was obtained through the pen, trap, and 2703 call data received pursuant to the April 12 court order.

In sum, the defendants' argument that there was improper interception of call data relies solely on inferences and speculation which lack factual support.. In contrast, the government has provided testimony, corroborated by a contemporaneous report and court orders, evidencing that all of the intercepted call data was obtained legally.

Consequently, and for all of the foregoing reasons, it will be recommended that Terry's motion to suppress be denied.

## III. TERRY'S MOTIONS IN LIMINE

In my opinion, Terry's motions in limine are best decided by the trial judge since he will be

in the best position to evaluate and weigh the appropriate considerations for admissibility of the challenged evidence in the context of the actual trial. For that reason, this court will defer entirely to Judge Clevert with respect to Terry's motions in limine. The parties are encouraged to bring these particular motions to Judge Clevert's attention at the final pretrial conference.

## IV.  BUCHANAN'S MOTIONS/REQUESTS

Buchanan, the only defendant in the second superseding indictment who had not been named previously in the first superseding indictment, filed a motion to suppress evidence. Buchanan also filed with the court a notification (which is captioned "Request for Pre-trial Notice of Government's Intent to Use Evidence of Other Crimes or Bad Acts") that he had requested "from the government notice in advance of trial of the nature of any other crimes, wrongs, or acts evidence that the government intends to use either in its case in chief or when it cross-examines Donald Buchanan should he choose to testify." (Req. at 1.) Finally, Buchanan also filed a "Demand for Specific Kyles and Brady Information." (Demand at 1.) Because Buchanan does not seek relief from this court in either his Request or his Demand, the court will not issue any order with respect to those filings. However, for the reasons set forth below, the court will recommend that Buchanan's motion to suppress be denied.

Buchanan was a passenger in a vehicle being driven by defendant Mark Cubie, which vehicle was stopped and searched by Milwaukee Police Officers Brosseau and DeValkenaere on February 2, 2005. However, defendant Mark Cubie previously filed a motion to suppress the evidence obtained as a result of that same event. Indeed, an exhaustive evidentiary hearing was conducted with respect to the facts surrounding that vehicle stop and search on December 27, 2005. In fact, Buchanan himself was a witness at that hearing. And, after affording the parties an opportunity to

19

file written submissions on the question of the legality of that vehicle stop and search, this court issued its recommendation to Judge Clevert that Cubie's motion to suppress be denied. Judge Clevert adopted that recommendation and denied Cubie's motion to suppress on May 31, 2006.

To be sure, Buchanan asserts in his motion to suppress that "there appear to be important gaps in information related to when and how communication was made between law enforcement agents involved in the investigation and stop of Cubie and Buchanan on February 2, 200[5], [and that therefore] counsel believes that an evidentiary hearing will be required on this . . . motion, despite the fact that an evidentiary hearing was held on co-defendant Cubie's similar motion." (Mot. at 4.) More specifically, the issues that Buchanan claims need to be addressed at the requested evidentiary hearing are set forth in his motion are as follows:

1. Whether there was reasonable suspicion to justify the stop of the vehicle in which Buchanan was a passenger on February 2, 2005?

2. Whether there was probable cause to seize the occupants of the vehicle in which Buchanan was a passenger on February 2, 2005?

3. Whether the information communicated between law enforcement agents who were involved in the investigation of the vehicle and its occupants prior to the stop of the vehicle and the law enforcement officers who actually conducted the stop of the vehicle was sufficient to establish reasonable suspicion for the stop of the vehicle? Relatedly, whether the officer who actually made the request for the stopping officers to conduct he stop had sufficient information available to him at the time to justify the request? Relatedly, whether the officers who received the request to stop the vehicle had sufficient information to justify the stop?

4. Whether the information communicated between law enforcement agents who were involved in the investigation of the vehicle and its occupants prior to the stop of the vehicle and the law enforcement officers who actually conducted the stop of the vehicle was sufficient to establish probable cause for the seizure of the occupants of the vehicle?

(Mot. at 4-5.) However, those are the very same factual issues that were considered and decided by

20

this court previously. Such being the case, there is no need for an evidentiary hearing. Even more importantly, for the reasons set forth in its Recommendation and Order of February 7, 2006, this court recommends that Buchanan's motion to suppress be denied.[6]

Finally, Buchanan filed a motion in limine seeking to admit as evidence "a written statement of codefendant Mark Cubie as a statement made against Cubie's penal interest under Fed. R. Evid. 804(b)(3)." (Mot. at 1.) As is the case with Terry's motions in limine, Buchanan's motion in limine is best decided by the trial judge since he will be in the best position to evaluate and weigh the appropriate considerations for the statement's admissibility in the context of the actual trial. For that reason, this court will defer entirely to Judge Clevert with respect to Buchanan's motion in limine. The partes are encouraged to bring this particular motion to Judge Clevert's attention at the final pretrial.

## V. RECOMMENDATIONS AND ORDERS

**NOW THEREFORE IT IS RECOMMENDED** that Terry's Second Motion to Suppress Title III Intercepts (dkt. #294) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that Buchanan's Motion to Suppress (dkt. #285) be **DENIED**;

**NOW THEREFORE IT IS ORDERED** that Cubie's (dkt. #303), Nicksion's (dkt. #311), and Hill's (dkt. #339) motions to adopt Terry's Second Motion to Suppress Title III Intercepts be **GRANTED**;

**IT IS FURTHER ORDERED** that Terry's (dkt. #319) and Buchanan's (dkt. #321) Motions

---

[6] Of course, to the extent that Buchanan seeks to preserve his right to object to the legality of the stop and search, he has successfully done so by filing the instant motion to suppress.

Case 2:05-cr-00146-PP    Filed 01/03/07    Page 21 of 22    Document 341

in Limine be and hereby are deferred entirely to Judge Clevert for decision.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) - (C), Federal Rule of Criminal Procedure 59(a) - (b), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any order or recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation and order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 3rd day of January, 2007, at Milwaukee, Wisconsin.


s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

22